## Richmond

### John Grover Potter, Jr.

### v.

### Commonwealth of Virginia

October 16, 1981.

Record No. 802088.

Present: All the Justices.

*J. Casey Struckmann; Hubert H. Marlow, Jr.* (*Greco & Struckmann, P.C.*, on brief), for appellant.
*James T. Moore, III, Assistant Attorney General* (*Marshall Coleman, Attorney General*, on brief), for appellee.

PER CURIAM.

John Grover Potter, Jr., was convicted of second degree murder and his sentence fixed at imprisonment for fifteen years. On appeal, he contends that the trial court erred in granting, over his objection, an instruction which read:

> The Court instructs the jury that where the killing, although intentional, is done in passion in the [heat] of blood, upon sudden provocation by gross indignity, the law reduces the offense to manslaughter. But, however great the provocation may have been, if there has been a sufficient time for passion to subside and for reason to return, the homicide is murder.

Timothy Kevin King's body was found at approximately 10 p.m. on February 14, 1980, alongside a Warren County road about five miles from the residence he shared with his wife, Barbara. An autopsy revealed ten stab wounds in King's chest and back, three of which penetrated his lungs, and a number of lacerations and contusions of the head and face. According to the medical examiner, death resulted from numerous blows to the head with a blunt instrument. The cumulative effect of these blows, which caused skull fractures and damage to the brain, would have been immediate unconsciousness followed by death at an indeterminate time thereafter. The examiner estimated the time of death to be 9:30 p.m.

Police officers described the scene where the body was found and the condition of King's van, which was found several miles away. Both revealed signs of a struggle. A police officer testified that the van was "very bloody," both inside and out, and in a state of disarray. In addition to the extensive bloodstains on the road,

hair and flesh were found some twenty feet away from the body. King's bloody hunting knife was discovered in close proximity to his body.

Five days after the killing, the defendant was questioned, and he made a statement to the police. Potter said that his car broke down on the night of February 14, 1980, and he walked to the nearby King house seeking transportation. Defendant approached King and asked for "a ride home." King, who recognized Potter, agreed, and the two men left the premises in King's van. According to Potter's statement, King, who was driving the van, deviated from the proper route to Potter's home. Defendant said that when asked why he was doing this, King replied, "we will go this way for a few minutes." Potter's signed statement continued as follows:

> Then he looked at me and asked if I had an [affair] with Barbara. I said no, we were just [friends]. He then pulled off to the right on a road just past the bridge. Tim kept saying that I did. I kept telling him to take me home, I reached for the door handle so I could jump out and run, and he pulled out an orange or red knife about 5 inches long and grabbed me with the other hand. I then grabbed his arm that had the knife in it to keep him from stabbing me. We then wrestled around in the front of the van for a few seconds and I felt something under my feet. I picked it up and swung it still holding on to Tim's arm. The item I picked up was a heavy metal object. With the first swing I struck Tim in the forehead with the object. I just kept [swinging] the object and hit Tim 3 or 4 more times. Tim was bleeding at this time. At this time both of us came out of the van on the passenger side, we were still struggling. While we were coming out of the van I dropped the heavy metal object and Tim dropped the knife. Once I saw the heavy metal object on the ground I knew it was a tire-iron. At this time Tim was reaching down on the ground and I picked up the knife. We were both on our knees. At this time I stabbed Tim with his knife about 3 times, and threw the knife down. Tim then got up and fell up against the bank. I then picked up the tire tool and hit Tim in the head I don't know how many times. I then got back in the van and went up the road a little and turned around. I did bang the front of the van into the bank. After turning the van around I was terrified and crying and wanted to get out

of there. Coming back down the road it felt like I hit some-
thing, but I don't know what it was. . . .[1]

Potter said he drove King's van back to the area near his car,
"got [the car] cranked and [rode] around to get my head straight.
The next thing I remember is when I got home."

Defendant and Barbara King worked together at Warren Me-
morial Hospital. Although Potter denied having an illicit relation-
ship with Mrs. King, Dale Butler, a friend of Potter's, testified
that Potter said he was dating a married woman named Barbara
who had a child.[2] Additionally, defendant told police that he and
Barbara King had "ridden around" the evening of the homicide.
Mrs. King invoked her Fifth Amendment privilege and declined to
answer questions about her actions on February 14, 1980. She
also declined to answer questions about her relationship with the
defendant.

The statement given by Potter was the only evidence available
to the Commonwealth showing the circumstances surrounding the
altercation which led to King's death. The defendant did not tes-
tify, and there were no other witnesses to the killing. While there
was testimony that an individual fitting Potter's description was in
the vicinity, no one positively identified Potter as that individual.

Defendant contends that there is no evidence of any cooling pe-
riod, or "any lapse of time between the commencement of the
combat [between defendant and King] and the delivery of the
mortal stroke to the deceased by the accused." Potter argues the
evidence shows that he reacted in self-defense to King's aggressive
actions, and that King's actions caused a sudden transport of pas-
sion in him which resulted in the killing of King.[3]

The Commonwealth's position is that the provocation in this
case is slight. It asserts that there is ample evidence to support the
inference that defendant was Mrs. King's lover and that defen-
dant willingly and knowingly placed himself in a position of con-
frontation with the decedent. The Attorney General argues that

[1] The medical examiner did not testify that a vehicle inflicted any injury on the dece-
dent. The Commonwealth does not contend that the decedent died as the result of such an
injury.

[2] Barbara King testified that she and her husband had one child.

[3] King was twenty-five years old, weighed approximately 190 pounds and was six feet
tall. Potter, a high school student at the time of the killing, was eighteen years old, weighed
155 pounds and was five feet eleven and one-half inches tall.

defendant could have left the van when it stopped, or fled the scene while King was on his knees. Pointing to the ten stab wounds and the number of blows delivered to decedent's head, the Commonwealth maintains "[t]here was no mutual combat in this killing," rather the death resulted from "the systematic bludgeoning of a helpless individual."

We find no objection to the first sentence of the challenged instruction because there is ample evidence to support an instruction on manslaughter. However, the only direct evidence of the events culminating in King's death is found in defendant's statement. While the jury was not compelled to accept the entire statement as true, there is nothing therein from which a jury could find or infer that there was a cessation of hostilities between the commencement of the struggle and defendant's flight from the scene. Potter, through his statement, claimed that the fight commenced in the van and continued until his repeated blows debilitated King. No evidence which contradicted this claim was introduced.

■ The question before us is whether the trial court erred in instructing the jury that "if there has been a sufficient time for passion to subside and for reason to return, the homicide is murder." A cooling period contemplates time and opportunity for passion to subside. The challenged instruction invited the jury to conclude that because the fight lasted for several minutes, "a sufficient time elapsed for passion to subside and reason to return." While the sufficiency of time for cooling is a question of fact to be decided by the jury, the time to be considered is the interval between the provocation and the act, not the time during which the *furor brevis* controls.

In *M'Whirt's Case,* 44 Va. (3 Gratt.) 594 (1846), some twenty-four hours elapsed between the alleged provocation and the homicide. In *Crockett v. Commonwealth,* 187 Va. 687, 47 S.E.2d 377 (1948), three hours passed between the provocation and the homicide. There, the court observed that a jury question was presented as to whether a sufficient time had elapsed for passion to have subsided. And in *McClung v. Commonwealth,* 215 Va. 654, 212 S.E.2d 290 (1975), the provocation preceding the homicide had occurred over a period of two years and consisted of innumerable abusive and harassing acts by the decedent.

The Commonwealth's contention that there were two fights, one inside the van and another outside, is not supported by the evidence. According to Potter's statement, the struggle began in the

van, progressed through the passenger door, and continued in the area around the van to its finish. The only evidence presented at trial showed that there was a continuous fight which resulted in King's death. There is no evidence here which supports the "cooling instruction" given by the trial court.

We find no merit in the Commonwealth's argument that the granting of the instruction, while prejudicial, was harmless error. The instruction permitted the jury to convict defendant of second degree murder, provided there had been "sufficient time for passion to subside and reason to return." While the giving of an instruction on second degree murder was proper, the defendant was also entitled to a proper instruction defining manslaughter, unencumbered by any reference to a "cooling period" which the evidence showed did not exist. As we pointed out in *McClung, supra,* "[i]t is . . . immaterial that the jury did not believe that the defendant killed in self defense as defined in the instruction they heard." 215 Va. at 657, 212 S.E.2d at 293. "The plea of self-defense and of passion . . . are not in conflict with each other." *Wilkins* v. *Commonwealth,* 176 Va. 580, 583, 11 S.E.2d 653, 655 (1943). Therefore the jury's rejection of Potter's defense of self-defense does not necessarily indicate it also rejected his defense of passion. Had the jury been properly instructed on voluntary manslaughter, it could have found that this homicide met that definition.

For the error in granting the instruction complained of, the defendant's conviction will be reversed, and the case will be remanded for a new trial.

*Reversed and remanded.*