# Richmond

## John Joseph LeVasseur

### v.

## Commonwealth of Virginia

June 17, 1983.

Record No. 822050.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and Harrison, Retired Justice.

*Charles J. Zauzig, III* (*Coleman & Zauzig*, on brief), for appellant.

*Donald R. Curry, Assistant Attorney General* (*Gerald L. Baliles, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the court.

In a bifurcated jury trial conducted pursuant to Code § 19.2-264.3 *et seq.*, John Joseph LeVasseur was convicted of the wilful, deliberate, and premeditated killing of Pamela Benner, in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), and his punishment was fixed at death.[1] On November 5, 1982, after considering the probation officer's report, the trial court imposed the death sentence. The defendant's appeal has been consolidated with the automatic review of his death sentence and given priority on our docket.

The facts will be stated in the light most favorable to the Commonwealth. Pamela Benner was nineteen years old in February

---

[1] In a separate non-jury trial, the defendant was convicted of the robbery of Pamela Benner and sentenced to life imprisonment. That conviction is not before us in this appeal.

1982. After leaving high school, she had worked at the Pentagon, but on February 25, 1982, was unemployed and living in her parents' home in Woodbridge. She was acquainted with the defendant, but was not particularly fond of him. It had been more than three months since she had last seen him. She stayed at home most days, but, having an interest in popular music groups, she attended band performances at night. Frequently, she invited band members, their wives, and girlfriends to her parents' home during the day. Mr. and Mrs. Benner were both employed. They became concerned about occasional items missing from the house and habitually locked the door to their bedroom to safeguard their belongings. Pamela's brother, Rick, also worked during the day and kept his bedroom door locked for the same reason.

About 5:40 p.m. on February 25, 1982, Pamela's parents and brother returned home from work together. The front door was open. There was a strong smell of "ammonia, Clorox or something of this nature," and the kitchen exhaust fan was running. The doors to both the parents' and Rick's bedrooms had been kicked in. The locks and many wood splinters were on the floor. There were bloodstains on the broken doors and pieces of hair and blood on the floor. Pamela's purse was in the middle of her bed, and some articles from it had been emptied onto the bed.

In a downstairs family room they found Pamela's body. Her ankles were bound together with masking tape and a cord from a stereo headset. An ice pick and a two-pronged carving fork were protruding from her back. She had three "penetrating wounds" beside the right eye, and over forty other wounds, abrasions, and lacerations covering her body. The back of her head was crushed by blows from a blunt instrument. There were some stab wounds which showed no hemorrhaging. In the medical examiner's opinion, this indicated that they had been inflicted after heartbeat had ceased. Some of the wounds to the hands were described as "defensive," evidently incurred while the victim tried to ward off additional blows. She was clad in a long green bathrobe. It and the body had been soaked in a liquid bleach, which discolored the fabric and burned the skin. A curtain rod lay on her body, and a fireplace poker lay on a blanket near her feet. Charred marks on the carpet indicated that an unsuccessful effort had been made to burn the body. A telephone jack receptable was found on the floor near the victim's feet. A latent fingerprint was found on it which proved to be the defendant's.

The defendant's blood-spattered shoes and clothing were later found in a plastic bag in a trash "dumpster" some distance from his home. Forensic laboratory tests identified the stains as having been made by the victim's blood. Various items stolen from the victim's family home the day of the murder were found in the bag with the clothing. Some of these items had been kept in the locked bedrooms which had been kicked open.

Gerald Frazier testified that he had known the defendant for two years. At about 4:15 p.m. on February 25, 1982, the defendant came, with his wife, to the apartment where Frazier was visiting, and asked "if I could give him an alibi, that he needed to say that he was with me from two to four o'clock . . . that day." The defendant was smiling and seemed normal. He showed no signs of being under the influence of drugs or alcohol. Frazier told him that he would be unable to provide an alibi because he had attended a job interview at 2:30 p.m. When he asked why an alibi was needed, the defendant said "he had killed somebody." He said it had been a girl named "Pam . . . . some big, fat slob . . . I went to rob her." Frazier testified that the defendant told him:

A. He said that he came in through the back of the house. And he said that first he hit her in the back of the head with some object. I can't remember what the object was, but he hit her with it and she fell to the floor.

And he said she pleaded with him to stop, to leave her alone. She even said that she loved him so that, you know, he would leave her.

And he said, you know, the bitch wouldn't die and he kept hitting her. And then he said he got a two-pronged kitchen fork and stabbed her, and an ice pick, and stabbed her repeatedly with that.

And then he said that he looked for money and all he could find was about two sixty-five in change, or something like that. Then he said that he couldn't stand to be in the house any longer.

He tried to destroy the evidence by using a bleach or laundry detergent — that's what he said — to pour over her. To get rid of fingerprints and things like that. Then he said —
Q. Did you ask him anything about the effect of that bleach?
A. No.
Q. Go ahead.

A. Well, he just said, you know, he thought it was like acid. You know, he thought it would remove the fingerprints and destroy the evidence or whatever.

The defendant then told Frazier that he had gone home, changed clothes, showered, and threw his clothing in a "dumpster" at the Bayview Apartments. Frazier told him to "go and turn himself in. And I didn't want to have any part to do with it. I wasn't going to give him an alibi or anything."

Later that evening the defendant called Frazier and held the telephone close to a police radio scanner to which the defendant was listening. Frazier could hear the police radio transmissions discussing a "possible D.O.A." The defendant told Frazier he was thinking of going to Kentucky to stay with a relative.

The next day the defendant went with his attorneys to the Garfield substation and surrendered himself to the police. He stood by a police officer who was seeking the issuance of a robbery warrant from a magistrate. When the officer stated that the Benners had reported a theft of about twenty dollars in cash from their home, the defendant, who had been given *Miranda* warnings, interrupted and said, "I only got three dollars."

Later, while riding with an officer in a police car, the defendant said, "If I'd burned her, I wouldn't have to go through this . . . [expletive deleted]." The defendant later testified that he could not recall making this remark, but that he might have said it and would not deny it.

The defendant made no denial of the atrocious nature of the crime or of his responsibility for the killing. This was made clear to the jury in the opening statement of the defense. Defense counsel told the jury that the evidence would not show the defendant guilty of capital murder, but rather would show guilt of "a lesser degree of murder."

The defendant testified that he was living with his wife and child in his mother's home in February 1982. His father, with whom he was particularly close, had died the previous year. The defendant is Vietnamese, having been adopted by the LeVasseurs when he was two years old. He was unemployed at the time and felt guilty about living in his mother's home because he was not helping her with the family printing business. He said that he looked for jobs sporadically. He was depressed and attempted to relieve his depression by the heavy use of illegal drugs.

On February 25, 1982, he said his wife awoke him around 10:30 a.m., and asked him if he was going out to look for a job. He said he dressed and smoked "from seven to ten bong hits" of marijuana, which was not unusual for him. He then went to two service stations which had advertised for help, but was turned down by both. He then went to a restaurant and consumed "two beers" plus "a hit of acid" (lycergic acid diethylamide, or LSD), on a piece of paper. He said he then felt "limp" and had impaired vision. He went to Pam Benner's house because it was nearby and he wanted to get out of the car and either "crash out or just talk about what's happening."

Pam, he testified, did not immediately answer the door. He looked in a basement window and saw her in the recreation room "sitting and eating eggs, I think, watching T.V." He attracted her attention, and she admitted him to the home. He said he "had a migraine headache, and . . . was feeling terrible . . . I felt like there was a brick inside my head." He said they discussed his work situation, his living arrangements, and the recent death of his father. Pam had formerly worked in the LeVasseurs' print shop and had a photo album containing a picture of his father. She showed this to him and "was making snide remarks because we had it made or I really had it made as far as living under the same roof with my mother and getting free meals and working in the same place of employment." Then, he testified, " I didn't take too kindly of it and I started getting upset and then the next thing alls I remember was a flash of light went into my head and — all I remember is seeing my father in Walter Reed — I mean Fort Belvoir Hospital."

He said he then heard a woman's screams, but the next thing he remembered seeing was Pam's body with "two objects sticking from the back." He said he had been sitting behind Pam, massaging her back, when the "flash of light" occurred, and that he remembered none of the intervening events.

The defendant further testified that he "went hysteric and panic," ran up the stairs and kicked open two doors "to get out." He remembered the smell of bleach and the bloodstains on his shoes, pants, and hands. He saw the masking tape and "rope" around the victim's ankles.

The defendant said that he had no recollection of removing any objects from the house, but that while he was driving home he noticed that he had with him, lying on the passenger seat of the

car, a photo album, a calculator, two watches, "and money lying all over the seat." When he arrived home, he said he was feeling "disgust [sic] and scared." His wife told him to take a shower while she put all of the items taken from the Benner home, together with the defendant's clothing, into a plastic bag. He testified that while in the shower, he saw a murder inside his head. "It was me beating up on Pam Benner . . . with a poker." He and his wife then drove to the Bayview Apartments where they disposed of the plastic bag in a "big, giant dumpster." They then went to a bank where his wife withdrew some money. "[A]t the time we didn't know whether I was going to skip town or turn myself in."

The defendant largely corroborated Frazier's testimony. He admitted that he had gone to Frazier to ask him for an alibi and that he had disclosed the murder. He did not recall having referred to the victim as "a fat slob," but said he would probably have said it "to be macho at the time." He admitted having said to Frazier that "the bitch wouldn't die." Asked to explain this remark, he said, "Because — well, when I was in the house there was more than just stabs on her." He remembered having called Frazier later and listening to reports of a "possible D.O.A." on the radio scanner.

Later that evening the defendant called another friend, Mike Hamilton, to "come over and party with me — I've got some good pot." Hamilton had other plans. The defendant then took "about 15 to 20 bong hits and had about two or three glasses of Jack Daniels." The next day, accompanied by his counsel, he surrendered himself to the police.

The defendant denied going to the Benner house for the purpose of robbing Pamela. He did admit, however, that two weeks earlier he had discussed with Mike Hamilton the prospect of committing burglaries and specifically proposed a robbery of another woman for the purpose of raising money.

In rebuttal, the Commonwealth called three fellow inmates of the Prince William County jail, with whom the defendant had, while in custody, discussed the case. All were convicted felons. Bruce Jackson testified that the defendant told him that he had gone to Pam's house for sexual favors, that when she rebuffed him he had beaten her with a poker, and that he had gone upstairs to the kitchen, obtained a large fork, an ice pick, and a steak knife, stabbed her with them and then poured some kind of "detergent" over her. He said that the defendant described taking watches,

calculators, and money from the house, all of which he later hid in a garbage bag with his clothing.

Donald McKenna testified that the defendant told him a similar story as to his motive, that the defendant said the victim's skull "sounded like a coconut breaking when he was hitting her," with the poker, that the defendant said "the bitch wouldn't die," and that after obtaining the fork and ice pick, he lay down beside the body to ascertain the location of the heart in order to be sure to stab her fatally.

Louis Aris Mendy testified that the defendant told him that he had argued with Pam over money. The defendant gave him a similar account of the beating and stabbing, then said that he returned to the kitchen, got some "Clorox," and poured it over the body.

The defense was based entirely upon the contention that the defendant was so affected by the drugs and alcohol he had ingested that he was incapable of premeditation or deliberation at the time of the killing. He further argues that the evidence shows that the intent to commit robbery did not come into existence until after the killing, and that he was therefore guilty of no more than second-degree murder. The defendant filed fifty-six assignments of error, which he has reduced to eleven questions presented on appeal. We shall consider them *seriatim.*

A. Jury Selection.

I. *Voir Dire* Examination as to Jurors' Attitudes
Toward the Death Penalty.

The defendant argues that subjecting veniremen to a test as to their ability to apply the death penalty, in a proper case, deprives him of a fair cross section of the community and provides him with a jury that is "guilt prone." He sought to introduce statistical evidence to this effect, similar to that relied upon in *Hovey* v. *Superior Court,* 28 Cal.3d 1, 616 P.2d 1301 (1980).

We have specifically approved the examination of veniremen, on *voir dire,* as to their willingness, or lack thereof, to impose capital punishment. *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979); *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied,* 451 U.S. 1011 (1981). Moreover, we have expressly rejected the type of evidence adduced in *Hovey, Justus* v. *Commonwealth,* 222 Va. 667, 283

S.E.2d 905 (1981), *cert. denied*, 455 U.S. 983 (1982), and we continue to adhere to that position.

## II. Change of Venue.

■ The defendant filed a motion for a change of venue which was argued six days before trial. In support thereof, he offered sixteen newspaper clippings and a privately-taken local opinion poll. The court received the newspaper clippings in evidence, but rejected the results of the opinion poll. No affidavits were offered in support of the motion. The court denied the motion, but stated that it might be renewed if *voir dire* questioning should reveal widespread prejudice against the defendant. The court also indicated its intention to question the veniremen directly with respect to pre-trial publicity and possible bias resulting therefrom.

At trial, thirty-three veniremen were subjected to *voir dire* questions, at first together and then in groups of two. Three were excused because of personal acquaintance with the defendant or the victim. Of the remaining thirty, only ten recalled any exposure to publicity concerning the case. None of them was aware of any bias against the defendant, none had formed an opinion as to his guilt, and all stated a willingness to lay aside whatever they had heard or read and to decide the case solely on the evidence and the court's instructions. Indeed, the defendant concedes on brief that "the record discloses no widespread prejudice during voir dire," but argues that this is of little significance since *voir dire* was limited and the judge's questions were "leading."

We find no undue limitations in the record as to *voir dire* questioning on the subject of bias. The trial judge asked questions designed to elicit responses showing the effects of pretrial publicity, and there is no indication that appropriate follow-up questions would have been prohibited, if any had been indicated. In fact, none were requested.

■ It is presumed that a defendant can receive a fair trial in the locality where the offense occurred, and the burden is on the accused to overcome that presumption by clearly demonstrating widespread prejudice against him. *Coppola v. Commonwealth*, 220 Va. 243, 248, 257 S.E.2d 797, 801 (1979), *cert. denied*, 444 U.S. 1103 (1980). The trial court's discretion in ruling upon such a motion will not be disturbed in the absence of a clear showing of abuse. *Clanton v. Commonwealth*, 223 Va. 41, 50, 286 S.E.2d

172, 177 (1982). No such showing was made here. The news articles tendered to the court simply reported the facts, which are shocking in themselves. They were not inflammatory. They were numerous, but sheer volume of publicity is not alone sufficient to justify a change of venue. *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 538, 273 S.E.2d 48, 52 (1980), *cert. denied*, 451 U.S. 1031 (1981). The trial court's discretion was not abused.

### III. *Voir Dire* Examination as to Jurors' Attitudes Toward the Use of Drugs.

■ After all prospective jurors had been subjected to *voir dire* questioning as a group, they were sequestered and groups of two were brought into the courtroom for further questioning. One of these pairs consisted of Anna V. Cornwell and Linda Curren. The court propounded questions to both concerning pre-trial publicity, the existence of any bias or prejudice, the formation of opinion. as to guilt, willingness to base a verdict solely on the law and the evidence, and attitudes toward the death penalty. The Commonwealth Attorney asked two questions concerning their willingness to impose the death penalty if the law and evidence so warranted. When defense counsel arose to question them, the following colloquy ensued:

The Court: Mr. Zauzig.
Mr. Zauzig: I would assume that both of you are opposed to drugs, the use of illegal drugs. Do you have any bias or prejudice that would make you unable to consider the usage by the defendant, of illegal drugs, as part of his defense?
Ms. Cornwell: Say that again.
Mr. Zauzig: Would you be able to — would you be unable to consider the usage by the defendant of illegal drugs, as a part of his defense?
Ms. Cornwell: I think so.
The Court: You would be able to consider it or —
Ms. Cornwell: I would be against the use of the drugs.
The Court: That presumption is there for all law-abiding citizens.
The fact that he might have used that — the fact that it may develop that he had used illegal drugs, could you consider that as a part of his defense?
Ms. Cornwell: No.

Mr. Zauzig: Your Honor, I have a motion.
The Court: Motion is denied.

Notwithstanding this ruling, the record discloses that Anna Cornwell was struck from the jury as a result of peremptory challenge by the Commonwealth, rather than by the defendant. The defendant argues that he had a constitutional right to twelve impartial jurors who would freely entertain his defense of voluntary intoxication, and erroneously argues on brief that he was forced to use one of his peremptory strikes to remove her, since she "harbored a bias and prejudice toward the use of [illegal] drugs, which was a fundamental issue in the trial."

Leaving aside the defendant's error in asserting that this ruling cost him a peremptory strike, his underlying argument is fallacious. Indeed, it is to be hoped that all responsible citizens are prejudiced against the use of illegal drugs. A challenge for cause based upon such a question would eliminate from the jury all except those who approve of crime. A proper question, which might have been framed to meet the defendant's concern, would have inquired whether the juror could follow the court's instruction which would reduce the defendant's criminal responsibility if the jury found that he was so affected by voluntary intoxication as to be incapable of premeditation or deliberation. The questions, as asked, are equivocal: "Would you be able to — would you be unable to . . . ." They were in fact clearly misunderstood by the juror: "I would be against the use of the drugs." Further, a question which asks whether the juror would be able to consider the use of illegal drugs "as a part of his defense" is so ambiguous as to render the answer meaningless. Does it ask whether the juror would consider drug intoxication a mitigating factor, or does it ask whether the juror would treat it as total justification or excuse for the crime, necessitating an acquittal? No principle of law would support the last premise. Because the question was improper, the motion to challenge the juror for cause was properly denied.

### IV. Further *Voir Dire* Questions Concerning Attitudes Toward the Use of Illegal Drugs.

At a pretrial hearing, the court directed counsel to submit in writing their respective proposed *voir dire* questions. In response, the defendant submitted a list of fifty-eight questions,

eight of which inquired elaborately into the attitudes of veniremen toward illegal drugs in general.

The court held that the proposed questions were argumentative and ambiguous. However, the court advised counsel that he would have an opportunity to rephrase them and that such an effort would be considered at the beginning of trial. The defendant made no objection to the ruling, but agreed to rephrase the questions.

No written rephrasing of the questions appears in the record. Counsel was, however, permitted to propound questions on this subject orally to the prospective jurors as they came before the court in groups of two. Each time the question was asked, its phraseology differed. The first time it was used, counsel asked: "Do any of the two of you, or would either of you be unable to consider evidence of the use of illegal drugs in support of defense to the crime of murder?" There was no response. With each successive pair of veniremen, the question became more convoluted, but no more precise. Eventually, the Commonwealth objected. The court suggested a revision, which would meet the objection, but counsel, rather than adopting the suggestion, rephrased the question as quoted in the previous section, and propounded it to Anna Cornwell.

After the Cornwell colloquy, another pair of jurors was subjected to *voir dire* examination. When defense counsel arose to interrogate them, the court stated:

> Mr. Zauzig, the other question which you have asked in the past has been rephrased. The Court has previously ruled on this question and how this should come forward. It did not come forward. What your question in the past has been getting at is, in effect, asking the jury to sanction what is an illegal act. For that reason, I'm denying you the right to ask that question as far as any further prospective jurors are concerned.

The defendant made no further effort to improve the question, but objected and challenged this ruling on appeal.

Code § 8.01-358, as amended in 1981, now makes the direct questioning of prospective jurors by counsel a matter of right. *Cf. Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011 (1981). It provides in pertinent part:

> The court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any *relevant* question to ascertain whether *he is related to either party*, or *has any interest in the cause*, or *has expressed or formed any opinion*, or is *sensible of any bias or prejudice therein. . . .*

Code § 8.01-358 (emphasis added). While the 1981 amendment makes mandatory the formerly discretionary right of counsel to question the prospective jurors directly, it has no effect on the nature of the questions which may be asked. The questions propounded by counsel must be relevant, as always, and the trial court must, in its discretion, decide the issue of relevancy, subject to review for abuse. *See Bassett* v. *Commonwealth*, 222 Va. 844, 853, 284 S.E.2d 844, 850 (1981); *Deal* v. *Nix & Son, Inc.*, 206 Va. 57, 63, 141 S.E.2d 683, 688 (1965); *Slade* v. *Commonwealth*, 155 Va. 1099, 156 S.E. 388 (1931). The test of relevancy is whether the questions relate to any of the four criteria set forth in the statute. If an answer to the question would necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice, it must be permitted. Questions which go beyond this standard are entirely within the trial court's discretion. *Davis* v. *Sykes*, 202 Va. 952, 121 S.E.2d 513 (1961).

■ A party has no right, statutory or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*. The court must afford a party a full and fair opportunity to ascertain whether prospective jurors "stand indifferent in the cause," but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so.

■ Here, the defendant made no proffer of the questions he would have asked of subsequent prospective jurors. On appellate review, we can only assume that they would have been similar to those put to the series of veniremen culminating with Anna Cornwell. For the reasons stated in the preceding part of this opinion, the court did not abuse its discretion in excluding such questions. They were not relevant to a determination of bias or prejudice. Rather, they were calculated to elicit a prospective ju-

ror's underlying attitude toward the use of illegal drugs generally.[2] Such attitudes might well be interesting to counsel, but they have no relationship to the juror's ability to abide by the court's instructions, to find the facts impartially, and to apply the law to the facts conscientiously.

Moreover, the record indicates that the trial court afforded the defendant every reasonable opportunity to ask relevant questions which would be designed to elicit bias or prejudice on the part of prospective jurors. At least seven opportunities were given to counsel to rephrase the question, finally accompanied by a direct suggestion from the court, which was not followed. The questioning actually conducted by the court was sufficient to preserve the defendant's right to trial by a fair and impartial jury, and we find no abuse of discretion in the court's refusal to permit further *voir dire* questioning by the defendant on the subject of illegal drugs.

### V. *Voir Dire* Questions as to a Juror's Ability to Impose the Death Penalty.

During the questioning of prospective jurors in groups of two, questions were put by the court to Rudolph Woltner and Edward Tostenson. Mr. Woltner responded to the effect that if capital murder were proved, he would automatically vote to impose the death penalty. Without awaiting a challenge, the court excused him for cause. The Commonwealth's Attorney then questioned Mr. Tostenson:

Mr. Ebert: Mr. Tostenson, if under the law and the evidence of this case, as it develops, it develops that the death penalty

---

[2] At the time of *voir dire* questioning, the veniremen had not been instructed in the law relating to the defense of voluntary intoxication. The questions gave them no legal framework by which to fix the inquiry in the context of that defense. The veniremen might properly have been asked whether they objected so strongly to the use of illegal drugs that they would be unable to follow an instruction by the court which would reduce the defendant's criminal responsibility if the jury found from the evidence that he was so affected by the voluntary ingestion of such drugs that he was incapable of premeditation or deliberation, a requisite element of capital murder.

Without such a framework, the questions were abstract. As noted above, the veniremen could readily infer that they were being asked if they could acquit the defendant if they found that he was using illegal drugs. There being no such principle of law, the only effect of the questions was to elicit the intensity of the veniremen's objections to criminal conduct.

is one of the alternatives available to you, could you consider voting for that alternative?

Mr. Tostenson: I'm not sure.

Mr. Ebert: Well, you'll have to tell us one way or the other. I understand you're not sure, but are you saying that you don't know? Do you have any feeling as to whether or not you could consider that alternative?

The Court: May I ask him the second part of the question?

Mr. Ebert: Let me ask you the second part of the — the next thing I was going to ask you — could you actually vote, as one of 12 jurors, for the death penalty, should the law and the evidence warrant the same?

Mr. Tostenson: For the death penalty?

Mr. Ebert: Yes.

Mr. Tostenson: I don't know if I could be party to that or not. There is some doubt in my mind.

The Court: Excuse me, Mr. Ebert. I don't think there is any necessity in going any further and causing this gentlemen to agonize. Mr. Zauzig, do you insist upon questions to be asked?

Mr. Zauzig: Yes; I'd like to ask some questions, Your Honor, if I can.

The Court: All right; I'll permit you to ask questions.

Mr. Zauzig: Mr. —

Mr. Ebert: Your Honor, at this point, I would object. It seems to me that from his answers, he does have at least a moral or philosophical problem with the potential of imposing the death sentence and I don't think he should be questioned further or permit the defendant —

The Court: Let me ask that question; excuse me, Mr. Zauzig. Do you have a moral or philosophical problem with imposing the death penalty, regardless of how severe the facts and circumstances — the evidence may be — not facts and circumstances, but the evidence?

Mr. Tostenson: Would you please repeat that question?

The Court: Do you have a moral or philosophical problem with imposing the death penalty, regardless of how severe the evidence might develop to be?

Mr. Tostenson: I suppose I would.

The Court: Under the circumstances, Mr. Zauzig, I see no reason to go any further.

The defendant objected to this ruling, citing *Witherspoon* v. *Illinois*, 391 U.S. 510, *reh'g denied*, 393 U.S. 898 (1968), and further objected on the ground that he was not given an opportunity to "rehabilitate" Mr. Tostenson by further questioning. Defense counsel pointed out that, under *Witherspoon*, the mere fact that a juror had religious or moral objection to the death penalty would not alone warrant his exclusion; he could be excluded for cause, in effect, only if he would refuse under any circumstances to consider it. The court responded: "Mr. Zauzig, the Court has ruled on that, and it is my interpretation from his answers that he has that problem."

A prospective juror may be excluded for cause if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980). We have interpreted *Witherspoon* to mean that a juror who is irrevocably committed to vote against the imposition of the death penalty may be excluded for cause. *Coppola* v. *Commonwealth*, 220 Va. 243, 250, 257 S.E.2d 797, 802 (1979), *cert. denied*, 444 U.S. 1103 (1980). Whether a juror is thus "irrevocably committed," is a mixed question of law and fact for determination by the trial court.

> As fact-finder, the trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror. We are aware that, while the words employed may, when transcribed and read in retrospect, appear ambivalent, the judge who heard them uttered was uniquely positioned to assess their ultimate import.

*Smith* v. *Commonwealth*, 219 Va. 455, 464-65, 248 S.E.2d 135, 141 (1978), *cert. denied*, 441 U.S. 967 (1979). The trial judge must satisfy himself that the juror's commitment against the death penalty is "unmistakably clear." This finding of fact cannot be disturbed on appeal unless we can say, upon consideration of the *voir dire* as a whole, that it was erroneous. *Id*. at 465, 248 S.E.2d at 141.

We can neither see nor hear Mr. Tostenson. Factors beyond the printed record of his response led the trial court to conclude: "it is my interpretation from his answers that he has that

problem." It was apparent to the trial court that his commitment against the death penalty was "unmistakably clear," and that his ability to perform his duties, within the statutory scheme governing a capital murder case was, in the words of *Adams* v. *Texas*, "substantially impair[ed]." 448 U.S. at 45. We cannot say from an examination of the *voir dire* as a whole that this finding of fact was erroneous.

■ The defendant's contention that he was denied an opportunity to "rehabilitate" Mr. Tostenson, suffers from the same infirmity as his argument concerning his right to ask further *voir dire* questions on the subject of illegal drugs. No proffer was made as to the further questions which might have been put to the prospective juror, and we are unable to determine from the record whether they would have been relevant, or whether their exclusion would have been an abuse of discretion. Rule 5:21.

■ Moreover, when *voir dire* examination has disclosed a juror's state of mind which warrants his exclusion for cause, further questions put to him for the purpose of "rehabilitating" him can have little effect. *See Justus* v. *Commonwealth*, 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980); *Breeden* v. *Commonwealth*, 217 Va. 297, 300, 227 S.E.2d 734, 736 (1976). Unless the subsequent questions serve to dispel a clear misunderstanding or correct an inadvertent misstatement, the trial judge is left with the ambiguous task of deciding which answer is more reliable, the first or the last.

B. The Guilt Phase.

VI. Evidence of Defendant's Mental History and the Effects of Drugs.

1. Emotional problems.

■ The defendant offered in evidence, at the guilt phase of the trial, certain school records from his childhood and the testimony of two social workers who had counselled him from 1974 until January 1982. The purpose of the evidence was to show that the defendant had a long history of anti-social behavior, emotional problems, difficulties in controlling impulses, low self-esteem, and involvement with alcohol and drugs. In addition, expert opinions were offered from a clinical psychologist and a psychiatrist who had interviewed and administered tests to the defendant while he

was in custody awaiting trial. The purpose of their testimony was to show that the defendant, although not psychotic, suffered from a "borderline personality disorder." Because the only defense offered in the case was that of voluntary intoxication, the defendant contends that this evidence was probative of his mental state at the time of the offenses, *i.e.*, that he was in a condition which precluded premeditation and deliberation. The trial court excluded most of this evidence at the guilt stage, but permitted its introduction at the penalty stage of the trial as matter in mitigation of punishment. The defense was also permitted to make an extensive proffer of the excluded evidence out of the jury's presence at the guilt stage, and its content is a part of the record.

When, as here, no insanity defense is interposed, the defendant's mental condition is only relevant insofar as it might be probative of a fact in issue: *i.e.*, premeditation at the time of the killing. Neither the school records, nor the history of the defendant's past "problems" related by the social workers was competent to address this issue, and they did not purport to do so. Rather, the defendant argues, they were proper as foundation for the opinions of the experts, to which we now turn.

Dr. Reuben Horlick, a clinical psychologist, interviewed the defendant three times and administered a battery of psychological tests. He opined that the defendant had a "low to average level of general intelligence," with an I.Q. of 95. He described him as "a seriously disturbed individual" who acted "in an immature and impulsive manner." His diagnosis was "borderline personality basic disorder . . . aggravated by substance abuse and alcohol." He offered no opinion on the question whether the defendant's mental condition was such, on February 25, 1982, as to affect his ability to premeditate and deliberate.

Dr. David Lanham, a psychiatrist, interviewed the defendant three times in jail. He agreed with Dr. Horlick's diagnosis of "borderline personality disorder," and opined that the defendant would be prone to impulsive behavior. On cross-examination during the penalty phase he was asked:

Q. [I]s there anything about this disorder which would prevent an individual from planning and thinking about committing a crime?
A. I would say that impulsive behavior is much more likely. But it would not prevent, necessarily, a planning.

Neither expert expressed, nor was asked to express, an opinion as to the defendant's mental state at the time of the crime, and neither characterized his underlying condition as one which would necessarily affect his ability to premeditate. If the evidence had been admitted, the jury would have been required to speculate as to what, if any, effect it might have had upon the crucial fact in issue. In *Spruill* v. *Commonwealth*, 221 Va. 475, 479, 271 S.E.2d 419, 421 (1980), considering medical testimony as to mental state which dealt only with "possibility," we said:

> In order for such testimony to become relevant, it must be brought out of the realm of speculation and into the realm of reasonable probability; the law in this area deals in "probabilities" and not "possibilities."

The proffered evidence suffered from the same infirmity as that we rejected in *Spruill*, and the trial court correctly excluded it.

2. Effect of Drugs.

 The defendant further sought to elicit from Dr. Lanham an expert opinion as to the effect of LSD upon a user, particularly a user suffering from a "borderline personality disorder" such as his. Here, the defendant relies upon *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 629-32, 292 S.E.2d 798, 806 (1982), *cert. denied*, 459 U.S. 1228 (1983), where an expert toxicologist, without objection, testified to the individual and cumulative effects of LSD, Tranxene, and alcohol. In response to a hypothetical question, the witness then gave a positive opinion that the ingestion of various quantities of these drugs in combination could neither cause the user to commit violent acts nor render him incapable of premeditating them. This was probative upon the issue of premeditation by reason of its certainty. It met the test of *Spruill* because it did not leave the jurors adrift to speculate in an area of expertise beyond their knowledge.

Here, by contrast, Dr. Lanham's opinion was expressed in the proffer as follows:

> Q. Can you testify to a reasonable degree of medical certainty that a person as I just told you, ingesting those types of drugs, could you tell me if a person could perpetrate the acts such as homicide without premeditation?

A. It's entirely possible; yes.

The defendant was permitted to describe his own condition, at the time of the offense, to the jury. The jury also heard the testimony of Gerald Frazier, Michael Hamilton, and the defendant's mother as to his appearance and demeanor that day. Frazier and Hamilton described his use of drugs, and Frazier testified as to his condition when under their influence. This factual testimony, although circumstantial, was probative of the fact in issue. The proffered expert testimony, however, raised only a "possibility." It failed to meet the test of *Spruill*, and was properly excluded.

VII. Improper Question by Commonwealth's Attorney.

▋ On direct examination, the defendant was asked:

Q. How did you feel towards your mother after you left?
A. Sorry.

On cross-examination, the Commonwealth's Attorney asked:

Q. Did you not say that you felt sorry for your mother?
A. That too; yes.
* * * *
Q. Did you have any hard feelings towards your mother?
A. No.
Q. Did you ever make the statement that you would like to have your mother done away with?

Defense counsel objected. The court immediately excused the jury for a ten-minute recess, told the Commonwealth's Attorney that the question had been "most inappropriate," and announced his intention to give a cautionary instruction. The defendant moved for a mistrial which the court denied. The court said: "I do not intend to repeat the question because I think to repeat it would be just to amplify it." The jury was then recalled and instructed by the court:

Ladies and gentlemen of the jury, just prior to the recess, the Commonwealth was questioning or cross-examining the witness. Please disregard the last remarks that the Commonwealth Attorney made in its entirety.

We will give him a chance to go back to his cross-examination at this time; but I ask you to disregard the remarks or question that was asked and remarks made.

The defendant argues that the effect of this improper question was so prejudicial that the court's admittedly prompt corrective action could not remove it. We disagree. "[E]rror arising from an improper question or improper conduct of counsel may usually be cured by prompt and decisive action of the trial court without granting a motion for a mistrial." *Black* v. *Commonwealth*, 223 Va. 277, 286, 288 S.E.2d 449, 454 (1982). The Trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights had been so indelibly prejudiced as to require a new trial. Unless we can say as a matter of law that this determination was wrong, it will not be disturbed on appeal. Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given. *See Lewis* v. *Commonwealth*, 211 Va. 80, 84, 175 S.E.2d 236, 239 (1970).

Here, the trial court pointed out a significant circumstance bearing upon the degree of prejudice actually suffered by the defendant. When the improper question was asked, the defendant had recently completed his direct testimony in which he had, in effect, admitted beating the helpless victim to death with a fireplace poker. In comparison to that shocking story, any imputation that he might have once entertained unpleasant thoughts about his mother would pale into relative insignificance.

VIII. Second-Degree Murder as a Lesser-Included Offense.

 The court instructed the jury as to the element of capital murder and of first-degree murder. The jury was also instructed, at the defendant's request:

If you find that the defendant was so greatly intoxicated by the voluntary use of alcohol or drugs or both, that he was incapable of deliberating or premeditating, then you cannot find him guilty of capital murder.

Further instructions told the jury that if it entertained any reasonable doubt as to the grade of offense, it must resolve that doubt in the defendant's favor and find him guilty of the lesser offense; and

if it reasonably doubted that he was guilty at all, it must acquit him.

The defendant objected to the court's refusal to give an instruction on second-degree murder as an additional lesser-included offense. He argues that, although he admitted committing murder with a deadly weapon, the Commonwealth was nevertheless required to prove two elements to raise it to capital murder; (1) premeditation and deliberation, and (2) killing in the commission of a robbery. He contends that if the jury should find only one of these elements to have accompanied the killing, he would be guilty of first-degree murder, and if the jury should find neither element present, he would be guilty of second-degree murder.

In *Wooden* v. *Commonwealth*, 208 Va. 629, 634, 159 S.E.2d 623, 627 (1968), overruling an earlier decision to the contrary, we held that the trial court properly refused an instruction on second-degree murder where the evidence would support only findings of first-degree murder or not guilty. This was so notwithstanding the presumption that every homicide is second-degree murder. In *Wooden*, we adopted the view of the dissenting justices in *Plymale* v. *Commonwealth*, 195 Va. 582, 602, 79 S.E.2d 610, 620 (1954): "The presumption of second-degree murder yields to facts." No instruction should be given unless it is supported by evidence, and such evidence must be more than a scintilla. *Hatcher* v. *Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978).

It is true that if the jury found the element of premeditation and deliberation to be lacking, by reason of voluntary intoxication, it could not convict the defendant of capital murder. But we do not agree with the defendant that, under the evidence in this case, the jury could further find the element of contemporaneous robbery lacking, so as to reduce the crime to second-degree murder.

In *Haskell* v. *Commonwealth*, 218 Va. 1033, 1043-44, 243 S.E.2d 477, 483 (1978), we adopted the view that the felony-murder statute, Code § 18.2-32, applies where a killing is so closely related to a robbery in time, place, and causal connection as to make it a part of the same criminal enterprise. That statute makes murder, other than capital murder, in the commission of robbery, murder of the first degree. Premeditation and deliberation are not elements of felony-murder, but malice is. Malice inheres in the doing of a wrongful act intentionally or without just cause or excuse. Thus, the malice inherent in the robbery provides the malice

prerequisite for a felony-murder conviction. *Wooden* v. *Commonwealth*, 222 Va. 758, 284 S.E.2d 811 (1981).

In *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031 (1981), we held that the relationships of time, place, and causal connection between a robbery and a murder need not necessarily be jury questions. They could, in a proper case, be determined as a matter of law. Briley and his accomplices had intercepted their victim outside a restaurant, robbed him at gunpoint, and forced him to enter his own automobile, in which they abducted him for some miles to Mayo's Island in the James River. Arriving at the island fifteen to twenty minutes after the initial robbery, they shot the victim fatally. They drove away in his car, which they then stripped of parts and abandoned. We held that the killing involved there was so closely related in time, place, and causal connection to the robbery as to make it a part of the same criminal enterprise as a matter of law.

Applying these principles to the evidence before us, it is manifest that the robbery and the murder of Pamela Benner are even more inextricably connected than the crimes in *Briley*. The victim was, in the absence of her family, the custodian of the home and its contents. The property was stolen through the exercise of violence against her. The bloodstains on the splintered doors to the locked bedrooms in which the stolen property was kept are circumstantial evidence that her ability to protect the property had been subdued by overwhelming violence before the theft occurred. While it is impossible to ascertain the precise time of her death, in relation to the taking of the property, the Commonwealth's evidence shows that the defendant, having gone there to rob her, bound and beat her with a poker, before he went upstairs to the kitchen, leaving traces of blood and hair, to secure the ice pick and carving fork with which he then stabbed her repeatedly.

The defendant's evidence does nothing to separate the crimes as to time, place, or causal connection. Indeed, his version, if believed, makes it unmistakably clear that the robbery and the murder were a part of the same criminal enterprise. He admitted leaving the house, in possession of the stolen goods, spattered with blood. There was not a scintilla of evidence upon which the jury could have found the murder unrelated to the robbery in time, place, or causal connection. Only speculation could support such a finding. The record permits no construction except that of a com-

mon criminal enterprise as a matter of law. Thus, the court correctly refused to instruct the jury as to second-degree murder. *See Hopper* v. *Evans*, 456 U.S. 605 (1983); *Bunch* v. *Commonwealth*, 225 Va. 424, 304 S.E.2d 271 (1983).

■ We agree, moreover, with the Attorney General's argument that even if the refusal of a second-degree murder instruction were deemed to be error, it would, in the circumstances of this case, be harmless beyond a reasonable doubt. The jury's capital murder verdict makes clear that it rejected the defense of voluntary intoxication. Had that defense been believed, the jury would have been required, by the court's instructions, to make a first-degree, rather than a capital murder finding. Thus, even if the jury had been presented with a second-degree murder option, it could never have actually reached such a verdict in view of its finding, beyond a reasonable doubt, that the defendant acted with premeditation and deliberation.[3]

## C. The Penalty Phase.

### IX. Facial Constitutionality of Statutory Sentencing Procedure.

■ The defendant argues that Virginia's capital murder sentencing procedure is facially unconstitutional for the reasons we considered and rejected in *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980); *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980); *Waye* v. *Commonwealth*, 219

---

[3] In *Potter* v. *Commonwealth*, 222 Va. 606, 611, 283 S.E.2d 448, 451 (1981), and *McClung* v. *Commonwealth*, 215 Va. 654, 212 S.E.2d 290 (1975), we rejected the Commonwealth's contentions that the refusal of lesser-included offense instructions was harmless. Those decisions, unlike the present case, were based upon the fact that the jury's rejection of one defense did not necessarily indicate that it would also have rejected another defense, supported by credible evidence, which was the subject of the refused instruction. The defendant here relies on *Beck* v. *Alabama*, 447 U.S. 625 (1980). *Beck* is inapposite. It deals with an Alabama capital murder statute which required the jury to choose between capital murder and acquittal, excluding any lesser offense. The Supreme Court foresaw the danger that such a scheme might tempt the jury to convict a defendant of capital murder who was actually guilty of a lesser offense, rather than acquit him when he was obviously guilty of some crime. There was no such danger here. If the jury had any reasonable doubt as to the defendant's guilt of capital murder, but believed him guilty of a lesser offense, it would not have been forced to an acquittal, but rather could have convicted him of murder in the first degree.

Va. 683, 251 S.E.2d 202, *cert. denied*, 442 U.S. 924 (1979); and *Smith* v. *Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967 (1979). We adhere to the views expressed in those cases.

### X. Conflict between Code § 19.2-264.2 and Code § 19.2-264.4(C).

The defendant pointed out to the trial court, at the penalty phase, that Code § 19.2-264.2 provides that the trier of fact shall not impose the death penalty unless it makes one of the prerequisite findings "after consideration of the past criminal record of convictions of the defendant;" while Code § 19.2-264.4(C) provides that the death penalty shall not be imposed unless the Commonwealth proves beyond a reasonable doubt

> that there is a probability based upon *evidence of the prior history of the defendant* or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery of the victim (emphasis added).

He argues that the dichotomy between "past criminal record of convictions" and "prior history" renders the statutory scheme unconstitutionally vague. He made a motion *in limine*, at the beginning of the penalty phase, to restrict the Commonwealth to proof of his "past criminal record," and to exclude any other references to his "prior history." This argument is based upon the alleged vagueness of the term "prior history." He says that it does "not provide the defendant with an objective standard on which to prepare for the defense of the penalty phase," while "criminal record of convictions" does.

In *Smith* v. *Commonwealth*, 219 Va. 455, 477, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979), we rejected a contention that the language of Code § 19.2-264.4(C) was unconstitutionally vague. We relied on the reasoning of *Jurek* v. *Texas*, 428 U.S. 262, *reh'g denied*, 429 U.S. 875 (1976). The rationale of *Jurek* is apposite:

The task that a Texas jury must perform in answering the statutory question in issue [determining the probability of future criminal conduct, under a statute similar to Virginia's] is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine.

428 U.S. at 275-76 (emphasis added).

The admission of evidence, other than criminal convictions, as to the defendant's dangerousness, was expressly approved in *Quintana v. Commonwealth*, 224 Va. 127, 295 S.E.2d 643 (1982). We adhere to the views expressed in *Smith*, and reject the contention that unconstitutional vagueness affects the statutory scheme, either by reason of the terms of Code § 19.2-264.4(C), or because of the differing language of the two sections.[4]

### XI. Instruction to Consider Mitigating Circumstances.

■ The defendant tendered five proposed jury instructions at the penalty phase dealing with the jury's duty to consider mitigating circumstances in fixing punishment. All were either defective in form or erroneous statements of the law.[5]

■ Instead, the jury was instructed that the death penalty could not be imposed unless the Commonwealth proved at least one of the statutory predicates ("dangerousness" or "vileness," framed in the statutory language) beyond a reasonable doubt. Even if one or both were proved, the jury was told only that it

---

[4] We note that although the jury was instructed as to both the "dangerousness" and the "vileness" predicates for capital punishment, and the Commonwealth argued that both were present, the jury's verdict rejected "dangerousness" and fixed punishment solely on the basis of the "vileness" predicate. Obviously, a finding of "vileness" can be based only on the circumstances of the case on trial. The defendant's "prior history" is thus irrelevant to a finding of "vileness." "Past criminal record of convictions" and "prior history" would be relevant only to the "dangerousness" predicate.

[5] Instructions "D" and "E" referred to "death by electrocution." This term is improper. The method of execution of the death penalty is a legislative concern, not within the province of the jury. Instruction "G" told the jury that it *must* find that a mitigating circumstance exists if there is *any* "substantial" evidence to support it. Instruction "H" purported to establish limits on the aggravating circumstances which the jury might consider. Instruction "I" purported to establish a balancing test for the relative weight to be given to mitigating and aggravating circumstances. There was no authority for any of these instructions.

*may* fix the punishment at death; but if the jury believed from *all the evidence* that the death penalty was not justified, then it *shall* fix punishment at life imprisonment. The instruction further told the jury that if the Commonwealth failed to prove either predicate beyond a reasonable doubt, the jury must impose life imprisonment. These instructions adequately stated the statutory framework and were sufficient. *See Coppola* v. *Commonwealth*, 220 Va. at 255, 257 S.E.2d at 805.

■ The defendant argues that even if his offered instructions were not to be given, his constitutional right to have the jury consider all mitigating factors before deciding punishment was impaired by the trial court's refusal to give some instruction especially drawing the jury's attention to evidence in mitigation. We disagree. The defendant was given a full opportunity to adduce evidence in mitigation, and in fact did so. Over one hundred pages of the trial transcript are devoted to it, and it was fully argued. The jury was instructed to consider "all the evidence," and the burden of proof was correctly allocated.

We have repeatedly held that an instruction is improper which singles out one portion of the evidence for special emphasis. *Snyder* v. *Commonwealth*, 220 Va. 792, 797, 263 S.E.2d 55, 58 (1980); *Woods* v. *Commonwealth*, 171 Va. 543, 547-48, 199 S.E. 465, 467 (1938). We find no error in the court's rulings on the instructions at the penalty phase.

D. Statutory Sentence Review.

■ Although not argued on appeal, we must determine, by statutory mandate, "1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and 2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C).

A careful examination of the entire record shows no evidence of "passion, prejudice or any other arbitrary factor" which might have affected the jury's determination of punishment. As we did in *Fitzgerald*, we have examined the records in all the capital murder cases reviewed by this Court, taking particular note of the facts in those in which juries imposed capital punishment solely on the basis of the "vileness" predicate. We found that the vileness of Fitzgerald's treatment of his victim exceeded that of any prior

case we had reviewed until that time. We now conclude that LeVasseur's atrocious conduct toward Pamela Benner is a close competitor in sheer, unprovoked viciousness. We hold that the sentence of death is not excessive or disproportionate to sentences generally imposed by Virginia juries in crimes of a similar but less horrifying nature.

Having found no reversible error in the proceedings, and having independently determined that the sentence of death was properly imposed, we decline to disturb or commute the sentence and will affirm the judgment of the trial court.

*Affirmed.*

STEPHENSON, J., dissenting.

LeVasseur contends he was so intoxicated he was incapable of forming a willful, deliberate, and premeditated intent to kill the deceased, and therefore could not be guilty of capital murder. *Johnson* v. *Commonwealth*, 135 Va. 524, 115 S.E. 673 (1923). This was his only defense, and the trial court found there was evidence to support the giving of a jury instruction therefor.

Since his alleged voluntary intoxication was produced primarily by the use of illegal drugs, LeVasseur argues his counsel had the right during jury *voir dire* to ascertain whether a prospective juror would apply the voluntary intoxication rule even though illicit drugs were involved. I agree.

It is apparent from the record that defense counsel intended to question each prospective juror to determine whether he or she was "sensible of any bias or prejudice," Code § 8.01-358, respecting the use of illegal drugs, which would preclude that person from following the court's instruction respecting voluntary intoxication. Apparently, this line of questioning proceeded without incident until prospective juror Anna Cornwell was questioned. At that point, the Commonwealth's Attorney suggested to the court that the question defense counsel had been asking in this regard should be reframed, and the court instructed defense counsel to ask the following question: "Assuming that you are all opposed to the use of illegal drugs, would this fact, alone, prejudice you to such a degree that you could not consider their usage, if the evidence develops that they were used, as a part of the defense."

Essentially following the court's suggestion, defense counsel asked Cornwell the following question:

I would assume that . `. . you are opposed to drugs, the use of illegal drugs. Do you have any bias or prejudice that would make you unable to consider the usage by the defendant, of illegal drugs, as part of his defense?

. . . .

Would you be able to — would you be unable to consider the usage by the defendant of illegal drugs, as a part of his defense?

When Cornwell appeared not to understand the question, the court inquired: "the fact that it may develop that he had used illegal drugs, could you consider that as a part of his defense?" Cornwell responded in the negative. Thereupon, the defendant challenged Cornwell for cause. The court overruled this motion, and Cornwell was deemed qualified to serve as a juror in this case. Clearly, Cornwell did not "stand indifferent in the cause," and the defendant's challenge of her for cause should have been sustained.

When defense counsel began to question the next prospective juror, the court, *sua sponte*, ruled as follows:

Mr. Zauzig [defense counsel], the other question which you have asked in the past has been rephrased. The Court has previously ruled on this question and how this should come forward. It did not come forward.

What your question in the past has been getting at is, in effect, asking the jury to sanction what is an illegal act.

For that reason, I'm denying you the right to ask that question as far as any further prospective jurors are concerned.

As a result of this ruling, nine jurors in this case were not examined regarding any bias or prejudice they might have had respecting the use of illegal drugs as it related to LeVasseur's intoxication defense. In my judgment, this omission prejudiced the defendant and constituted reversible error.

The majority argues that defense counsel's question was both ambiguous, because the prospective juror did not know whether drug intoxication could be considered merely in mitigation or for acquittal, and irrelevant, because it only was "calculated to elicit

a prospective juror's underlying attitude toward the use of illegal drugs generally." I consider these arguments to be hyper-technical and strained.

While defense counsel's question may not have been a model of clarity, the prospective jurors, prior to Cornwell, apparently understood and answered it to the satisfaction of both the court and counsel. It is to be remembered that the court, not counsel, asked Cornwell the question which received her negative response. In addition, the court, at the instance of the Commonwealth's Attorney, framed the question which counsel was instructed to use for the remaining prospective jurors. My reading of the record indicates that counsel, on the single occasion afforded him, substantially complied with the trial court's instruction.

There is no doubt defendant's *voir dire* was extremely relevant in determining whether bias or prejudice existed, as it touched upon the only defense he advanced. The trial court has the ultimate responsibility of determining whether a prospective juror "[h]as a bias or prejudice against the Commonwealth or the accused," or whether there is "any reason to believe he might not give a fair and impartial trial to the Commonwealth and the accused based solely on the law and the evidence." Rule 3A:20. "The constitutional and statutory guarantee of an impartial jury is no mere 'legal technicality,' but a substantive right scrupulously to be observed in the day-to-day administration of justice." *Martin* v. *Commonwealth*, 221 Va. 436, 445, 271 S.E.2d 123, 129 (1980). If defense counsel's question was unclear, the trial court should have clarified it, rather than forbidding further questioning.

"Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis* v. *United States*, 339 U.S. 162, 171-72 (1950). In the present case, the defendant was not given this opportunity. Therefore, I would reverse the judgment of the trial court and remand the case for a new trial.

COCHRAN and POFF, JJ., join in dissent.