COURT OF APPEALS OF VIRGINIA

Present:  Judges Fulton, Friedman and Chaney
Argued at Norfolk, Virginia

UNPUBLISHED

SEAN ANTHONY MCNEIL

v.        Record No. 1069-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE JUNIUS P. FULTON, III
SEPTEMBER 26, 2023

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Christopher W. Hutton, Judge

Charles E. Haden for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Sean Anthony McNeil of second-degree

murder and use of a firearm in the commission of a felony.  McNeil maintains that the evidence was

insufficient to support his convictions because the evidence introduced at trial failed to exclude the

following reasonable hypotheses of innocence: (1) McNeil never planned the murder of the victim,

Reginald Jenkins, with malice aforethought, (2) McNeil acted in excusable self-defense, or (3)

McNeil shot the victim in the heat of passion, rather than with malice.  We find no error and affirm

the trial court's judgment.

                                    BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party [below]."  *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  In

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

doing so, we discard any of McNeil's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Gerald*, 295 Va. at 473.

On May 9, 2020, Reginald Jenkins lived at 2028 Richard Avenue in Hampton. Alicia Cofield, Jenkins's girlfriend, and her children were at Jenkins's home that day for a cookout. About ten people, including McNeil and Tarran Caudle, attended the cookout and consumed alcohol. During the event, McNeil argued with another man over a dice game. After that, Cofield noticed that McNeil had "some stuff on his nose" when he exited the bathroom; to Jenkins, she objected about what she suspected was McNeil's use of drugs in the presence of children. Jenkins and McNeil argued, and he ordered McNeil to leave. McNeil was angry that Jenkins chose to believe Cofield rather than him. McNeil left the scene with Caudle and a person named "Ray." McNeil and Caudle went to McNeil's mother's house to pick up McNeil's car. Caudle drove McNeil back to Jenkins's home so they could "patch things up" after their disagreement.

As McNeil and Caudle neared Jenkins's home in the vehicle, Jenkins threatened to "fuck . . . up" McNeil if he entered the yard. McNeil nonetheless got out of the car and entered the yard, and Jenkins struck him, knocking him to the ground. McNeil rose, but Jenkins knocked him to the ground a second time.[1] McNeil and Jenkins continued to argue for several minutes. Although Jenkins had a handgun in the pocket of his hoodie, he did not take it out during the fight. Cofield called the police.

Hampton Police Officer Joshua Dye responded to a call regarding a reported disturbance. Cofield approached the officer and asked him to remove McNeil from the property because he was drunk and causing trouble. At that time, McNeil was on the ground in front of the house and Caudle was helping him up. McNeil walked toward Jenkins, who was in front of the house.

---

[1] Caudle testified that McNeil also threw and landed punches during the altercation.

Recorded by Officer Dye's body worn camera, McNeil said to Jenkins, "I swear to God, I swear to God I'm going to kill you, boy." Using his thumb and two fingers to resemble a gun, McNeil pointed his hand at Jenkins. McNeil was angry and loud, and he appeared intoxicated. Officer Dye urged McNeil to get in the nearby car and leave; the officer said that if McNeil did not go, he would be arrested for public intoxication. With Caudle's help, McNeil got into the car. McNeil turned to Jenkins and warned him, "Protect yourself." Caudle drove McNeil away from Richard Avenue. The police left the scene after McNeil's departure.

Caudle took McNeil to McNeil's father's house, then to his mother's house. McNeil went inside the house and returned to the car with a shotgun. McNeil then drove back to Jenkins's home and said he wanted to "fuck [Jenkins] up." Caudle tried to calm McNeil and persuade him to return to his mother's home, but McNeil refused.

When they reached Jenkins's home, Caudle heard gunshots as he got out of the car. Caudle immediately fled the scene on foot.

About ten minutes after Officer Dye left Richard Avenue, he received a second call to return to that address. When the police arrived, they found Jenkins on the driveway, suffering from a gunshot wound. A nine-millimeter firearm was near Jenkins on the ground.

Jenkins died from a gunshot wound to the torso. More than 14 shotgun pellets were removed from Jenkins's body during the autopsy.

The police apprehended McNeil and questioned him in the early morning hours after the shooting. The police advised him of his *Miranda*[2] rights, and he indicated that he understood them. Because McNeil complained that his head was hurting, the police took McNeil for a medical evaluation. Afterward, the police returned McNeil to the police department.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

Initially, McNeil denied any knowledge about what had happened that night. The police showed McNeil still photos recorded by Officer Dye's bodycam of the altercation between McNeil and Jenkins that the officer had witnessed. Eventually, McNeil gave a written statement admitting that he obtained a shotgun from his mother's house "out of anger" and because Jenkins had punched him. He indicated he shot Jenkins because Jenkins "knocked [him] out and [he] felt like [his] life was threatened because [Jenkins] was shooting, too." However, McNeil also said he was upset with Jenkins because of the previous assault. McNeil said he "wanted to scare" Jenkins and "shoot the house up." McNeil admitted "shooting the car and then shooting toward" Jenkins. He claimed that after the shooting he left the shotgun at his mother's house, and he acknowledged that on the night of the shooting he had been drinking both beer and liquor.

Five nine-millimeter cartridge casings were on the ground near Jenkins's body and the handgun. The police found two 12-gauge shotgun shell cases in the road on Richard Avenue. A black Acura parked on the street had been damaged with a bullet. There were several bullet holes consistent with shotgun blasts in the side of the house just behind Jenkins's body.

Inside McNeil's car the police found unfired shotgun cartridges in the floorboard of the front passenger seat. The unfired cartridges matched the two spent cartridges found in the roadway on Richard Avenue. A fired shotgun case was found between the driver's seat and the center console of the car.

At trial, Detective Steven Rodey, one of the officers who questioned McNeil after the shooting, listened to a 911 call in which Jenkins could be heard making a report to the police just before the shooting started. Detective Rodey stated that in his opinion a shotgun blast can be heard on the recording first, followed by two shots from a handgun, then a shotgun blast.

Testifying on his own behalf, McNeil said he arrived at Jenkins's cookout at around 2:00 p.m. on May 9, 2020. While there, he drank beer and Hennessy. McNeil and some of the men

at the party disagreed about a dice game. He left the event because he heard that Jenkins wanted him to go. McNeil claimed that when he returned the first time, he asked Jenkins why he was angry. Jenkins asserted that McNeil was a "problem," then twice struck McNeil with his fist. McNeil claimed that he landed no blows in return.

McNeil stated that he was upset about Jenkins's behavior and because Jenkins refused to explain why he was angry with McNeil. McNeil said he then left Jenkins's home with Caudle, went to McNeil's mother's house, and grabbed the shotgun "for [his] own protection" because he planned to return to Jenkins's house, and he knew that Jenkins had a gun. However, McNeil claimed he never intended to use the gun or harm Jenkins; "[i]t was only to defuse the situation." McNeil said he intended to talk to Jenkins and "resolve the situation."

According to McNeil, as soon as he returned to Jenkins's house for the second time, McNeil heard gunshots. McNeil took cover beside his car and, after ascertaining from where the shots were being fired, returned fire with the shotgun. McNeil admitted that he fired the shotgun a second time. McNeil claimed that he thought he "was going to die" when he fired the shotgun. Without realizing that someone had been shot, McNeil said, he got back in the car and drove away.

At the conclusion of all the evidence, the trial court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter, as well as legal principles relating to malice, heat of passion, and self-defense. The jury found McNeil guilty of second-degree murder and using a firearm in the commission of a felony. The trial court confirmed the jury's verdict and found McNeil guilty. This appeal followed.

## ANALYSIS

McNeil challenges the sufficiency of the evidence to sustain his convictions for second-degree murder and using a firearm in the commission of a felony. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be

disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

McNeil contends that the evidence demonstrated that he shot Jenkins in the heat of passion rather than with malice aforethought.[3] "A killing done in the heat of passion and upon reasonable provocation will reduce a homicide from murder to voluntary manslaughter." *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003).

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997) (citing *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. [Malicious intent to wound] may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (alteration in original) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Volitional acts, purposefully or willfully committed, are consistent with a finding of malice and inconsistent with inadvertence." *Luck v. Commonwealth*, 32 Va. App. 827, 833 (2000). "Malice may be inferred 'from the deliberate use of a deadly weapon.'" *Doss v. Commonwealth*, 23 Va. App. 679, 686

---

[3] McNeil's first and third arguments on appeal—that the evidence was not sufficient to show malice aforethought and that the evidence demonstrated that he shot the victim in the heat of passion—are intrinsically related, and therefore we analyze them in tandem.

(1996) (quoting *Perricllia v. Commonwealth*, 229 Va. 85, 91 (1985)). "Deliberate and purposeful acts may nonetheless be done without malice if they are done in the heat of passion." *Williams v. Commonwealth*, 64 Va. App. 240, 249 (2015). Heat of passion "excludes malice when provocation reasonably produces fear [or anger] that causes one to act on impulse without conscious reflection." *Rhodes*, 41 Va. App. at 200 (alteration in original) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)). "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear or a combination of both." *Id.* at 200-01 (quoting *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986)).

"The [Virginia] Supreme Court [has] explained . . . that the appropriate measure for determining whether there was an opportunity for passions to cool is 'the interval between the provocation and the act, not the time during which the *furor brevis* controls.'" *Landeck v. Commonwealth*, 59 Va. App. 744, 759 (2012) (quoting *Potter v. Commonwealth*, 222 Va. 606, 610 (1981)). "If the evidence demonstrates that, during this interval, 'the accused reflected or deliberated, that his passion cooled, or that there was reasonable time or opportunity for cooling, then the wounding is attributable to malice and not heat of passion.'" *Id.* (quoting *Miller v. Commonwealth*, 5 Va. App. 22, 25 (1987)).

In determining that McNeil was guilty of second-degree murder, the jury necessarily concluded that he acted with malice, not in the heat of passion. "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v.*

*Commonwealth*, 13 Va. App. 296, 299 (1991)). Any "[p]otential inconsistencies in testimony are resolved by the fact finder." *Id.* at 292. Such conflicts are not revisited on appeal "unless 'the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion.'" *Id.* (alteration in original) (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006)). The fact finder is "free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc) (citing *Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991)).

In addition, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

Even before the police were called to Jenkins's home for the first time on May 9, 2020, Jenkins ordered McNeil to leave the party because Cofield was concerned about his presence there with children, given his behavior. After a verbal disagreement with Jenkins, McNeil left with Ray and Caudle. Nonetheless, McNeil returned to Jenkins's home with Caudle. Despite Jenkins's warning not to trespass on his property, McNeil exited the car and approached Jenkins. Jenkins struck McNeil twice and knocked him to the ground. Jenkins, however, did not threaten McNeil with a gun. McNeil then stated his intention to kill Jenkins. Walking toward Jenkins, McNeil exclaimed, "I swear to God I'm going to kill you, boy!" As Officer Dye's bodycam video demonstrated, McNeil made a hand gesture resembling a pointed gun. With persuasion from Officer Dye and assistance from Caudle, McNeil got into the car to leave the scene. Before he left, however, he warned Jenkins to protect himself.

McNeil then went to his mother's house and armed himself with the shotgun. On the way there, Caudle testified, McNeil said that he wanted to "fuck up" Jenkins, not that he wanted to have a peaceful discussion to resolve their disagreement. McNeil later told the police that he obtained the gun "out of anger" and because Jenkins had knocked him to the ground. Caudle tried to persuade McNeil not to return to the scene and cause more trouble, but he would not listen. Despite the fact that he had twice been told to leave and stay away, McNeil again returned to Jenkins's home, this time armed with a shotgun.

Thus, even if McNeil reacted in fear or rage immediately after Jenkins knocked him to the ground twice, the interval of time necessary to drive to his mother's house, obtain the shotgun, and then return to Jenkins's home was sufficient to provide McNeil with the opportunity for any passion to cool. Upon these facts and circumstances, a reasonable finder of fact could conclude beyond a reasonable doubt that McNeil shot Jenkins with malice, not in the heat of passion, and that he was guilty of second-degree murder and using a firearm in the commission of that offense.

McNeil also argues that the evidence proved that he acted in self-defense. "Self-defense is an affirmative defense to a charge of murder, and in making such a plea, a 'defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors.'" *Commonwealth v. Sands*, 262 Va. 724, 729 (2001) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "A claim of self-defense may be either justifiable or excusable; if it is either, the accused is entitled to an acquittal." *Lynn v. Commonwealth*, 27 Va. App. 336, 353 (1998) (citing *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958)), *aff'd*, 257 Va. 239 (1999). "Justifiable homicide in self-defense occurs [when] a person, *without any fault on his part in provoking or bringing on the difficulty*, kills another under reasonable apprehension of death or great bodily

harm to himself." *Id.* (alteration in original) (quoting *Bailey*, 200 Va. at 96). On the other hand, an excusable killing in self-defense occurs when a defendant, "although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Id.* (quoting *Bailey*, 200 Va. at 96).

McNeil maintains that "the killing was an act of excusable self-defense after Jenkins opened fire upon McNeil." However, Detective Rodey testified that, in the recording of the 911 call, a shotgun blast occurred first, before any handgun was discharged. Moreover, the evidence did not establish that McNeil either retreated as far as possible or announced his desire for peace before firing the shotgun blasts that killed Jenkins.

McNeil "was not entitled to an acquittal as a matter of law. What [McNeil] was entitled to and received were instructions on the subject[] . . . of self-defense if the jury believed him." *Bell v. Commonwealth*, 2 Va. App. 48, 56 (1986). A defendant may not claim he had a right to arm himself for self-protection when he obtained a gun before he had a reasonable belief another person intended to injure or harm him. *See Jordan v Commonwealth*, 219 Va. 852, 855-56 (1979) (holding that "[a] man cannot go a-gunning for an adversary" and then claim he killed in self-defense (quoting *Sims v. Commonwealth*, 134 Va. 736, 760 (1922))). Accordingly, we cannot say that McNeil established that he shot Jenkins in self-defense. Instead, the Commonwealth's evidence was competent, not inherently incredible, and sufficient to prove beyond a reasonable doubt that McNeil was guilty of second-degree murder and using a firearm in the commission of a felony.

CONCLUSION

For the foregoing reasons, the trial court did not err and we affirm the judgment.

*Affirmed.*