COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Huff,* Ortiz and Raphael
Argued at Norfolk, Virginia


FAREED NELSON LUCKETT

　　　　　　　　　　　　　　　　　　MEMORANDUM OPINION** BY
v.　　　　Record No. 1969-23-1　　　　JUDGE GLEN A. HUFF
　　　　　　　　　　　　　　　　　　FEBRUARY 25, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following trial in the Circuit Court of the City of Norfolk (the "trial court"), a jury found

Fareed Nelson Luckett ("appellant") guilty of voluntary manslaughter, in violation of Code

§ 18.2-35, and use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1.

The trial court sentenced appellant to six years' incarceration with four years suspended for the

manslaughter conviction and imposed the mandatory minimum of three years for the firearm

conviction.

On appeal, appellant contends the trial court erred in denying his motion for a mistrial

based on remarks in the Commonwealth's closing argument that impermissibly appealed to the

emotion, prejudices, or passions of the jury and expressed the prosecutor's personal opinion of

the defendant's guilt. Appellant further argues the trial court erred in denying his motions to

---

* Judge Huff prepared and the Court adopted the opinion in this case prior to the effective
date of his retirement on December 31, 2024.

** This opinion is not designated for publication. *See* Code § 17.1-413(A).

strike and to set aside the verdict for the firearm conviction because the evidence was insufficient to conclude he had acted with malice. Finding no error, this Court affirms the judgment below.

BACKGROUND[1]

I. Events leading up to the shooting

On or about May 1, 2021, appellant reported to police that his house was "shot up" by an unknown person. Police recorded evidence of shots fired through appellant's front door, the side of the house, and at the windows on the second floor. But, without sufficient leads on a suspect, police were unable to make an arrest.

On June 4, 2021, at approximately 12:27 p.m., appellant entered the Kappatal Cuts barbershop for a haircut; his barber told him that he was "next up." While appellant waited his turn, he was approached by an individual named Calvin Durham, II ("Durham"), who "asked to speak to [appellant] . . . outside." Appellant later testified that he knew of Durham's existence from a Facebook site called "SneakerHeads," but that he did not know Durham personally and had never spoken to him before.[2] After exiting the barbershop together, appellant and Durham got into a physical altercation that was recorded on the barbershop's surveillance video system.

---

[1] Parts of the record in this case were sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inference to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[2] Appellant explained that the Facebook group was for people who liked to buy sneakers. He said that he and Durham were members, but that he had never seen anything about Durham on the site.

- 2 -

Tyrell Courtney, the sole witness from the barbershop, corroborated the store's video, saying that he saw the fight happening after hearing "a lot of commotion going on outside."[3]  He described the "altercation" as two men "[y]elling, going back and forth with each other, a couple of swings were thrown."  Other people from the barbershop, including Courtney, went outside and broke up the fight.  Durham left briefly, during which time appellant paced back and forth inside the barbershop in an agitated state.  When Durham returned to the barbershop, he started to walk calmly past appellant, but appellant suddenly "pounced on [Durham] [and] punched [Durham]."  Appellant later admitted that Durham had said nothing to him upon his return, had nothing in his hands, and had not drawn any weapon in the moments before appellant punched and attacked him.

Courtney saw appellant punch Durham and witnessed both men "wrestling and scuffling" with more intensity than before.  During that struggle, Courtney glimpsed Durham in possession of two firearms but was unsure whether he also saw appellant with a gun.  After seeing appellant pin Durham against the "booth right in [the] front of the barbershop" where the two were "scuffling," Courtney "headed the other way" to get away from the commotion.  It was at that moment, with his back turned, that Courtney heard "a couple of loud bangs," "four, maybe five shots."  He immediately called 911.

II.  Post-shooting investigation and the Commonwealth's trial evidence

Officer Kyle Barnes of the Norfolk Police Department (the "NPD") was the first responder to arrive at the barbershop within five minutes of receiving "a call for a possible gunshot victim." Upon his arrival, Officer Barnes observed Durham lying on the floor in the barbershop near the door while "two citizens attempt[ed] to stop the bleeding from his chest with a towel."  After

---

[3] Detective Jean Claude Noel testified that there were "multiple witnesses" when he arrived at the crime scene and all were transported to the Norfolk Police Operations Center for an initial interview.  Subsequently, however, "the witnesses no longer wanted to cooperate with the police."

"determin[ing] that the chest wound was the most pressing issue," Officer Barnes initiated trauma care, applying chest seals to Durham's upper and lower chest gunshot wounds. When Officer Ryan Newcome of the NPD arrived, he also assisted Durham by applying gauze to a gunshot wound on Durham's lower belly. During those life-saving attempts, Durham went in and out of consciousness but was unable to speak.[4]

Officer Barnes accompanied Durham in an ambulance to the hospital, where his injuries were described as one through-and-through wound in the middle part of his abdomen[5] and a single entrance wound to the upper part of his abdomen, both shot from the front. While still in the ambulance, Durham went into cardiac arrest and was ultimately pronounced dead at 1:04 p.m., approximately 10 to 15 minutes after his arrival at the hospital.

Dr. Wendy Gunther, an assistant chief medical examiner for the Commonwealth, testified at appellant's trial about the results of the autopsy she performed on Durham. To begin, she categorized Durham's injuries as "gunshot wounds on his abdomen and some scattered small bruises on his forehead and shoulder, around the inside of his right elbow, [and] a couple on his hands." Dr. Gunther described one of the wounds as a "hard contact gunshot wound to the upper abdomen right at the edge of the ribs"; she explained that a hard contact gunshot wound is one "where the gun is pressed into the person's skin, so it[ is] in firm contact with the person's skin . . . [at] the moment the trigger was pulled."

She further described the second gunshot wound as the "short exit" for the first gunshot wound and that it was "shored on [Durham's] right side surrounded by a big bruise in the skin." As for the third gunshot wound, Dr. Gunther found the bullet in Durham's right hip and described the

---

[4] Officer Barnes retrieved a wallet from Durham's right rear pants pocket and removed a holster from Durham's right side belt loop. He identified Durham by the ID inside the wallet, including a driver's license and military ID.

[5] A through-and-through wound indicates an entrance and exit wound.

wound as having a "classic appearance." Based on her examination, Dr. Gunther determined that the cause of Durham's death was a gunshot wound to the torso. She found no drugs or alcohol in Durham's blood at the time of his death.

Meanwhile, Detective Jean Claude Noel of the NPD—the lead investigator assigned to this homicide case—reviewed the surveillance video from the barbershop. He identified appellant and Durham in the video starting with their first encounter that day until the shooting, after which appellant could be seen leaving the shop and running to the right with a firearm in his hand. That firearm was never recovered.[6]

Three other firearms, however, were collected from the barbershop. The first was a loaded Smith & Wesson MMP Shield firearm retrieved by Officer Newcome from Durham's left thigh pants pocket before he was transported to the hospital. The other two—a Taurus and a Sig Sauer P320—were taken from two barbershop employees.[7] Subsequent testing by Juliana Red Leaf from the Department of Forensic Science revealed that none of those firearms were ballistically consistent with either the shell casings found near Durham's body or the bullets recovered from Durham's wounds during his autopsy.[8] She did, however, determine that those "four caliber 0.380 auto cartridge cases . . . submitted were all identified to each other, so that was one gun" responsible for killing Durham.

---

[6] During Courtney's trial testimony, the Commonwealth played portions of the barbershop surveillance video showing the shooting and immediate aftermath. Courtney testified that the video showed a firearm on the floor of the barbershop after the shooting as well as a person he could not identify who "grabbed both of the[ firearms]" and fled the scene. That individual was never identified and the firearms he allegedly took were never recovered.

[7] There was no forensic evidence that those firearms, belonging to Courtney and another barber, were involved in the shooting.

[8] At the scene, Officer Newcome observed and recovered "at least four spent casings . . . near the victim [Durham]."

Three days after the shooting, appellant contacted Detective Noel and asked to speak to him. Appellant told Detective Noel that Durham had admitted to the shooting of appellant's house in May 2021.[9] Detective Noel confirmed the report of the May shooting and ensured that the firearms being tested from the barbershop shooting be compared to shell casings found at appellant's house after the May shooting. Red Leaf confirmed at trial that the "seven 9-millimeter Luger cartridge cases" Detective Noel had submitted from the May shooting at appellant's house ballistically matched the Smith & Wesson MMP Shield gun found in Durham's left pants pocket.

III. Appellant's trial testimony

Appellant testified on his own behalf at trial. He stated that he initially did not know why Durham wanted to talk to him on June 4, 2021, but that he accompanied Durham outside the barbershop for a conversation anyway. He claimed that Durham said, "[y]ou know what we talked about," before pushing appellant and attempting to punch him. Despite claiming he did not know what Durham was talking about, appellant testified that he pushed back and then the two of them "were tussling" until other people from the barbershop came outside and told them to "[b]reak it up." Appellant went back inside while Durham remained outside the shop.

Shortly thereafter, Durham reentered the barbershop and walked past appellant without saying anything. But, according to appellant, Durham subsequently made a comment to him about being the person who had shot appellant's house in May—"Yeah, I already got your house. I already shot your house." Appellant testified that he "[t]ried to separate [him]self away from [Durham] because [he] was kind of scared[ and] [he] didn't know what was going on." He

---

[9] No testimony at trial corroborated appellant's allegations about Durham's statements, and the surveillance video did not have audio.

described Durham leaving the barbershop again and walking to his car. Appellant said he saw Durham "open[ing] the door" and then "reaching [inside] for things."[10]

Appellant claimed that he saw a firearm "[o]n [Durham's] side" when Durham walked back into the barbershop.[11] When later confronted with the surveillance video, however, appellant acknowledged that Durham had nothing in his hand. But he maintained that Durham was "just kind of standing stocky like he could have something in his pants." Despite describing himself as being "[t]errified [and] [s]cared," appellant testified that he decided to "[s]wing on [Durham]. Maybe disarm him because he had a firearm."[12]

After swinging at Durham once, appellant successfully "took one of the firearms off [Durham's] side." He alleged that Durham charged at him, causing them to "scuffle, like, a wrestling thing" in which appellant was "kind of on top of [Durham]" while still holding the firearm.[13] Appellant then asserted that he felt Durham "grabbing for another firearm" before shooting appellant three times in the abdomen. In response, appellant shot back "[t]wo or three" times, first while their bodies were still pressed together and then again after appellant had gained some space so that he was "[k]ind of like standing up . . . over top of [Durham]." After that second shot, appellant said he "[t]urned around and ran up out of the barbershop" while Durham "continue[d] to shoot at [him]."

---

[10] Surveillance video showed Durham leaving and returning to the barbershop approximately 48 seconds later.

[11] Only after defense counsel asked appellant, "Did you just observe one firearm at that time?", did appellant correct himself and say, "No, two."

[12] Appellant denied being agitated at any point.

[13] Appellant was holding Durham with "[Durham's] head toward [appellant's] abdomen, and [appellant] was on top" with his head "toward the back of [Durham's] waist."

Defense counsel played a video clip from the barbershop's surveillance camera, in which appellant identified himself as the person lying on the ground at the end of the shopping center, a few stores away from the barbershop. The "person in the black standing next to [appellant]" in the video was his barber. Appellant testified that he did not know what happened to the gun he had used to shoot Durham and that he never saw it again. He then explained that the "two marks" on his abdomen were "bubble bullet hole[s]"—raised, deformed skin where Durham had shot him—and that he had another bullet hole in his "upper thigh area."[14]

On cross examination, the Commonwealth questioned appellant about the portion of the surveillance video purportedly showing appellant firing a third shot as he was running out of the barbershop. Appellant claimed he didn't remember firing that shot and that viewing the surveillance video did not refresh his memory.

IV. Appellant's motions to strike

Following the Commonwealth's case-in-chief, appellant made "one motion to strike" in which he asked the trial court to reduce the "second-degree murder [charge] to [voluntary] manslaughter . . . [because] the evidence as a whole has shown an amount of heat of passion that would have negated any sort of malice." In response, the Commonwealth asserted that its evidence at that stage in the proceedings was sufficient to find "that malice existed" even though "[t]he jury might find otherwise in deliberations." The trial court agreed that the Commonwealth had established a prima facie case for the second-degree murder charge and denied appellant's motion.

The defense then presented its own evidence, including appellant's testimony. At the conclusion of all the evidence, appellant renewed his motion to strike "on the same issue as

_____

[14] Appellant received initial treatment on scene by responding police officers and subsequently underwent surgery at the same hospital where Durham had been taken. Officer Barnes testified that he sat with appellant both during the surgery for appellant's abdominal gunshot wounds and while in the recovery room.

beforehand," arguing that the Commonwealth did not prove he "acted maliciously during this encounter [with Durham] especially with everything that's been elicited from the video and from [appellant]'s testimony." The Commonwealth argued that it had "established a prima facie case" and that "at this point the jury can find one way or the other beyond a reasonable doubt the defendant's guilt or innocence." Finding "that the evidence in its totality creates questions of fact" for the jury to resolve, the trial court denied appellant's motion.

The trial court then provided the jury with instructions on the offenses of second-degree murder, voluntary manslaughter, and use of a firearm "while committing or attempting to commit a felony; namely, murder." The court specifically instructed the jury that "the difference between murder and manslaughter is malice. When malice is present, the killing is murder. When it is absent, the killing can be no more than manslaughter."[15] The court further instructed the jury at length about whether certain actions constitute self-defense such that defendant should be found not guilty. Regarding the firearm charge, the trial court explained that the Commonwealth had to prove that appellant "used a firearm . . . while committing or attempting to commit murder." The parties then delivered closing arguments to the jury.

V. Appellant's motion for a mistrial

At the end of the Commonwealth's closing argument, the prosecutor made the following statement to the jury:

---

[15] The trial court also instructed the jury to resolve

> a[ny] reasonable doubt as to the grade of the [homicide] offense . . . in favor of the defendant and find him guilty of the lesser offense.

> For example, if you have a reasonable doubt as to whether he is guilty of second-degree murder or voluntary manslaughter, you shall find him guilty of voluntary manslaughter. If you have a reasonable doubt as to whether he is guilty at all, then you shall find him not guilty.

The fight was completed, and [appellant] reinitiated extreme violence that resulted in the death of Calvin Durham. . . . Calvin Durham deserves justice. He's, in fact, paid his debt. He's gone. Any kind of punishment with him is complete. It's done. But there has to be some accountability for the life of Calvin Durham, and we're asking that you hold this defendant, [appellant], accountable, because he did it. He reinitiated the contact, escalated the amount of violence, and it resulted in Calvin's death.

Appellant immediately objected and requested to make a motion "outside the presence of the jury," which the trial court permitted.[16] Appellant then moved for a mistrial on the grounds that the Commonwealth "indicated that the only way that justice can be performed here is to hold . . . [appellant] accountable for the killing of Mr. Durham" and that the "Commonwealth invoked justice in an improper manner."[17] By "saying justice is required for Mr. Durham, who paid the ultimate price as well as stating that they must hold [appellant] accountable," the Commonwealth "stepp[ed] away from commenting on the evidence, and is doing what is commonly referred to as an appeal to emotion."

In response to the trial court's request for authority on this matter, defense counsel cited to caselaw from other states and admitted that, "to the best of [his] knowledge[,] this issue has not been reached on the merits in Virginia." He nevertheless pointed to *Fain v. Commonwealth*, 7 Va. App. 626, 628 (1989), for the general proposition that "an argument to the jury which

---

[16] This is not the first motion for a mistrial that appellant made during the proceedings below. The first motion for a mistrial was based on the trial court's ruling that appellant could not introduce statements he made to Detective Noel while at the hospital because it would constitute "improper bolstering." Defense counsel argued that not allowing him "to rehabilitate [appellant] using a prior consistent statement that he has made previously . . . would overwhelm our ability to properly defend our client in this case because he's chosen to testify." The Commonwealth vehemently objected, and the trial court ultimately denied the motion.

[17] Defense counsel stated that "[j]ustice is usually the word that triggers [his] spidey sense on this sort of thing" but then said that he was not focusing his argument on justice. Rather, "it was the totality of the Commonwealth's argument by talking about how the victim paid the ultimate price and how there needs to be accountability against [appellant]." He acknowledged that there was not a statute in Virginia which prohibited the use of the word "justice."

appeals to sympathy, passion, or prejudice is not permitted." After due consideration, the trial court denied the motion for a mistrial, but ordered the parties to agree on a curative instruction. The trial court ultimately instructed the jury that "justice in this case is to follow the instructions of law that I have already given to you and to apply the law to the facts of this case. Justice does not require any particular outcome."

VI. Verdict and post-trial proceedings

The jury found appellant guilty of voluntary manslaughter—a lesser included offense of murder in the second degree—and use of a firearm in the commission of a felony. Appellant immediately moved to set aside the verdict "on the use of a firearm" conviction, under Code § 18.2-53.1, because the jury "found as a matter of fact and law and [appellant] is not guilty of murder and only guilty of manslaughter." The Commonwealth opposed the motion and relied on *Gray v. Commonwealth*, 28 Va. App. 227 (1998), to support its argument that "inconsistent verdicts are allowed" even in situations where a jury finds a defendant "guilty of involuntary manslaughter and use of a firearm in the commission of that murder."

The trial court pointed out, however, that Code § 18.2-53.1 "ha[s] a very specific list of predicate offenses that does not include manslaughter." It further noted that penal statutes are "strictly construed against the Commonwealth, [and] . . . [t]he verdict form makes reference to, 'We, the jury, find the defendant guilty of use of a firearm in the commission of murder as charged in the indictment.'" The court took the matter under advisement until appellant's sentencing hearing.

At that hearing, appellant reiterated that manslaughter is not a listed predicate offense under Code § 18.2-53.1 but conceded that "the Commonwealth is correct in the sense that Your Honor can allow this [inconsistent] verdict to stand, or in the alternative, you can disallow the verdict. We submit that completely to your judgment." Opining that the *McGuinn v. Commonwealth*, 298 Va.

- 11 -

456 (2020), case "speaks to the issue before the Court and seems to very, very forcefully dispose of the issue," the trial court declined to overturn the jury's verdict finding appellant "guilty of use of a firearm during the commission of a felony." The trial court then sentenced appellant to a total of nine years of incarceration with an active term of five years—six years with four years suspended for the manslaughter conviction, and three years as the mandatory minimum for the firearm conviction. This appeal followed.

ANALYSIS

On appeal, appellant assigns two errors to the trial court. First, that the trial court abused its discretion in denying his motion for a mistrial based on the Commonwealth's closing argument. Second, that the trial court erred in denying appellant's motions to strike and to set aside the verdict on the firearm conviction because the evidence was insufficient to conclude that he shot Durham with malice.

I. Appellant's Motion for a Mistrial

When a party moves for a mistrial, the trial court must determine, "in the light of all the circumstances of the case, whether the defendant's rights have been so indelibly prejudiced as to require a new trial." *Castillo v. Commonwealth*, 70 Va. App. 394, 445 (2019) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 589 (1983)). "The decision whether to grant a mistrial motion is a matter submitted to the circuit court's sound discretion," and we will not disturb such a decision on appeal unless it was erroneous as a matter of law. *Id.* (quoting *Lewis v. Commonwealth*, 269 Va. 209, 213 (2005)). "[A]bsent a manifest probability of prejudice to an adverse party, a new trial is not required when a court sustains an objection to an improper remark or question by counsel and thereafter instructs the jury to disregard the remark or question." *Lowe v. Cunningham*, 268 Va. 268, 272 (2004) (citing *Kitze v. Commonwealth*, 246 Va. 283, 288 (1993)).

"Conversely, as an exception to the rule, if the prejudicial effect of the impropriety cannot be removed by the instructions of the trial court, the defendant is entitled to a new trial." *Kitze*, 246 Va. at 288. Determining whether a statement by counsel is "so inherently prejudicial that [it] cannot be cured by a cautionary instruction" is a multi-factored analysis, including whether the "reference was deliberate or inadvertent in nature," the relevance of the content, and the "probable effect of the improper reference by counsel." *Lowe*, 268 Va. at 273. The reference must be "likely to inflame the passion or instill a prejudice in the minds of the jury." *Id.* "[N]ot every irrelevant statement or question will result in prejudice to an opposing party." *Id.*

Appellant argues that the prosecutor's statements in closing argument "impermissibly appealed to the emotions, passions or prejudices of the jurors and expressed the prosecutor's personal opinion as to the guilt of the Appellant." The alleged objectionable statement was, in pertinent part:

> The fight was completed, and [appellant] reinitiated extreme violence that resulted in the death of Calvin Durham [who] . . . deserves justice. He's, in fact, paid his debt. He's gone. Any kind of punishment with him is complete. It's done. But there has to be some accountability for the life of Calvin Durham, and we're asking that you hold [appellant] . . . accountable, because he did it. He reinitiated the contact, escalated the amount of violence, and it resulted in Calvin's death.

Appellant moved for a mistrial, claiming that the Commonwealth's opinion of guilt and justice was improper and that the Commonwealth was impermissibly appealing to the jury's emotions rather than focusing on the facts. The trial court denied the motion. After both parties agreed to draft an appropriate curative instruction, the trial court instructed the jury that "justice in this case is to follow the instructions of law that I have already given to you and to apply the law to the facts of this case. Justice does not require any particular outcome."

Assuming, without deciding, that the Commonwealth's objectionable statement was prejudicial, this Court concludes that the trial court negated any prejudicial effect with the

- 13 -

curative instruction. Here, the trial court "promptly, explicitly and carefully" instructed the jury immediately upon its return and before releasing it for the day. *Prieto v. Commonwealth*, 283 Va. 149, 169 (2012) (quoting *Lewis v. Commonwealth*, 211 Va. 80, 84 (1970)). "Juries are presumed to follow prompt, explicit, curative instructions from the trial judge." *Mills v. Commonwealth*, 24 Va. App. 415, 420 (1997); *see also LeVasseur*, 225 Va. at 589 ("Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given.").

"Considering the innocuous nature of the prosecutor's comment under all the circumstances of the case, [and] the circuit court's cautionary instruction to the jury, . . . [appellant's] rights were clearly not so indelibly prejudiced as to necessitate a new trial." *Blanton v. Commonwealth*, 280 Va. 447, 456 (2010) (prosecutor's comment during argument that defendant was in jail after the killing did not warrant a mistrial). The record contains no indication that the jury did not follow the trial court's instruction concerning the prosecutor's remark about what justice required. Accordingly, this Court finds no error in the trial court's denial of appellant's motion for a mistrial.

II. Appellant's Motion to Set Aside the Use of a Firearm Conviction

In his second assignment of error, appellant argues that the trial court erred in refusing to set aside the firearm conviction "because the evidence was insufficient to permit a reasonable trier of fact to conclude that" he had shot Durham "with malice."[18] He argued below that this conviction, premised on his use of a firearm in the commission of "murder," was a "legal impossib[ility]" because the jury convicted him of voluntary manslaughter, which is not a predicate offense under

---

[18] This Court notes that appellant did not directly challenge the firearm charge in his motions to strike; rather, he challenged the sufficiency of the evidence to prove malice regarding the charge for second-degree murder. Accordingly, the discussion of this assignment of error is limited to appellant's motion to set aside the firearm conviction.

- 14 -

Code § 18.2-53.1. On appeal, he asserts that the jury did not have sufficient evidence of malice, which is a required element of the underlying crime of murder. This Court disagrees, finding that the evidence was sufficient not only to reach the jury on all three crimes—murder, manslaughter, and use of a firearm—but also to support a conviction for any of those offenses.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Although appellant does not characterize the jury's verdict as "inconsistent," he begins his sufficiency argument by pointing out that (i) the jury was instructed it could only convict him of the firearm charge if the evidence established he had used the gun "while committing murder or attempting to commit murder," and (ii) the jury had been instructed that a conviction for murder required a finding that "the killing was malicious." "Verdicts or convictions are inconsistent when the essential elements in the count wherein the accused is acquitted are identical and necessary to proof of conviction on the guilt count." *Meade v. Commonwealth*, 74 Va. App. 796, 810 (2022)

- 15 -

(quoting *Wandemberg v. Commonwealth*, 70 Va. App. 124, 139 (2019)).  Unstated but inherent in appellant's argument, therefore, is the contention that the jury's decision to convict appellant of manslaughter but acquit him of second-degree murder evidenced a lack of malice as a matter of law.[19]  This perceived discrepancy between the murder acquittal and the firearm conviction raises a question of inconsistent verdicts that this Court ultimately resolves in favor of the Commonwealth.

It is well-established that a defendant can be indicted and convicted for using a firearm in the commission of murder, without being charged for the predicate offense of murder, "so long as the proof of a predicate murder was made to support the conviction."  *Strohecker v. Commonwealth*, 23 Va. App. 242, 258 (1996); *see also Davis v. Commonwealth*, 4 Va. App. 27, 31 (1987) (holding that "where an indictment is returned for an alleged violation of Code § 18.2-53.1, the underlying felony must be proved beyond a reasonable doubt," but need not be "separately indict[ed] and prosecute[d]").[20]  Inconsistent verdicts arise when a defendant has been charged with both offenses, convicted of the compound offense, and acquitted of the predicate felony.  Such "inconsistent verdicts rendered by a jury[, however,] do not constitute reversible error," *Akers v. Commonwealth*, 31 Va. App. 521, 529 (2000), "provided that the evidence supports the verdict challenged on appeal[,]" *Kovalaske v. Commonwealth*, 56 Va. App. 224, 233 (2010).[21]  The Supreme Court of Virginia has expressly refused to create "an exception to this rule" in cases, like

---

[19] The appellant in *Wolfe v. Commonwealth*, 6 Va. App. 640, 648 (1988), raised the same argument; namely, that "his conviction of voluntary manslaughter is an acquittal of murder and that consequently he may not be found guilty of use of a firearm in the commission of murder."  This Court addressed the issue of inconsistent verdicts raised by Wolfe's argument even though he "disclaim[ed] that he relie[d] on the concept of inconsistent verdicts."  *Id.*

[20] Although interpreting a prior version of Code § 18.2-53.1, this Court determined in *Davis* that "[t]here is no language in the statute which suggests that the legislature intended that an accused must be charged and prosecuted for the underlying felony."  4 Va. App. at 30.

[21] *But see Akers*, 31 Va. App. at 532 (holding "that appellant's *bench trial* conviction for use of a firearm in the commission of a malicious wounding after his implied acquittal for malicious wounding arising out of the same incident constituted error" (emphasis added)).

the one at hand, that involve "'compound and predicate offenses.'" *Barnes v. Commonwealth*, 80

Va. App. 588, 599 (2024) (quoting *McQuinn v. Commonwealth*, 298 Va. 456, 460 (2020)).[22]

Consequently, where "the evidence is legally sufficient to convict the defendant of the

predicate offense but the jury . . . convict[ed] the defendant of the compound" offense only, "the

apparently inconsistent verdicts must stand because the jury could have convicted the defendant on

both charges but quite possibly decided not to do so out of a sense of grace and leniency."

*McQuinn*, 298 Va. at 459; *see also Reed v. Commonwealth*, 239 Va. 594, 594-98 (1990) (upholding

defendant's conviction for using a firearm during a robbery even though the jury had acquitted him

of the robbery charge). "The most that can be said in such cases is that the verdict shows that either

in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show

that they were not convinced of the defendant's guilt." *Wolfe v. Commonwealth*, 6 Va. App. 640,

647 (1988) (quoting *United States v. Powell*, 469 U.S. 57, 63 (1984)); *see also Kovalaske*, 56

Va. App. at 233 ("Jury verdicts may appear inconsistent because the jury has elected through

mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that

seems in conflict with the verdict for another charged offense."). Therefore, "[a]s long as the

evidence supports both verdicts, they 'will be upheld, despite the apparent inconsistency.'" *Akers*,

31 Va. App. at 529 (quoting *Pugliese v. Commonwealth*, 16 Va. App. 82, 96 (1993)).

As discussed below, the evidence in appellant's case is likewise sufficient to support a

conviction for both murder and use of a firearm in the commission of a murder. Specifically, the

---

[22] The United States Supreme Court has similarly rejected requests for such exception in cases involving predicate offenses. *See United States v. Powell*, 469 U.S. 57, 68 (1984) (The "argument that an acquittal on a predicate offense necessitates a finding of insufficient evidence on a compound felony count simply misunderstands the nature of the inconsistent verdict problem. Whether presented as an [issue of] insufficient evidence" or one of inconsistent verdicts, "the argument necessarily assumes that the acquittal on the predicate offense was proper -- the one the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent.")

jury had sufficient evidence to conclude that appellant shot Durham with malice, irrespective of its decision to convict appellant of manslaughter instead of murder. *See, e.g.*, *Wolfe*, 6 Va. App. at 650 (affirming the jury's verdicts for voluntary manslaughter and use of a firearm in the commission of murder); *Gray*, 28 Va. App. at 233 (affirming the jury's verdicts for involuntary manslaughter and use of a firearm in the commission of murder).

Malice "includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief." *Williams v. Commonwealth*, 13 Va. App. 393, 398 (1991). "Whether . . . an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). The factfinder does not "distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). As such, "malice may be either express or implied by conduct." *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "Volitional acts, purposefully or willfully committed, are consistent with a finding of malice and inconsistent with inadvertence." *Luck v. Commonwealth*, 32 Va. App. 827, 833 (2000). Furthermore, "[m]alice may be inferred from the deliberate use of a deadly weapon." *Id.* at 834.

Here, appellant testified that Durham had taunted him at the barbershop, by saying that he shot appellant's house a month earlier, which led to their first physical altercation outside the barbershop. Even if true, "'words alone, however insulting or contemptuous, are *never* a sufficient provocation' for one to seriously injure or kill another." *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998) (quoting *Canipe*, 25 Va. App. at 643). Moreover, the jury heard testimony and saw

surveillance video that showed appellant attacking Durham without provocation when he returned to the barbershop. The attack included appellant putting Durham in a wrestling hold, taking Durham's own firearm—a deadly weapon—out of Durham's holster, and then deliberately using the deadly weapon against Durham by pressing it firmly to Durham's abdomen before firing.

Appellant's testimony that he attacked Durham because he thought Durham was going to shoot him is belied by the surveillance video and witness testimony, which establishes that Durham was not holding or reaching for his weapon at any point prior to appellant attacking him. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). Furthermore, any justification for appellant's actions ended prior to the final shot he fired into Durham's abdomen after distancing himself from Durham and beginning to run out of the barbershop with the firearm. *See English v. Commonwealth*, 43 Va. App. 370, 371 (2004) (permitting the factfinder "to believe or disbelieve, in whole or in part, the testimony of any witness").

Additionally, "it is today universally conceded that the fact of an accused's flight . . . [is] admissible as evidence of consciousness of guilt, and thus of guilt itself." *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991) (quoting *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir. 1970)). The trier of fact must consider the "nexus [that] must exist between the flight and the alleged offense." *Ricks v. Commonwealth*, 39 Va. App. 330, 335 (2002) (citing *Jarrell v. Commonwealth*, 132 Va. 551, 569 (1922)). Here, appellant fled the barbershop immediately after shooting Durham, still carrying the firearm he took from Durham and leaving his victim bleeding out on the floor.

Under the totality of these circumstances, including appellant's use of Durham's own firearm to shoot Durham two or three separate times, appellant's flight from the scene of the crime, and appellant's inconsistent and self-serving testimony, this Court finds that the jury had sufficient evidence to conclude that appellant shot and killed Durham with malice. As discussed above, that conclusion is not affected by the jury's decision to convict appellant of manslaughter instead of murder. Accordingly, the trial court did not err in denying appellant's motion to set aside the verdict for the firearm charge.

## CONCLUSION

Appellant first challenges the trial court's refusal to declare a mistrial based on the Commonwealth's reference to "justice" during its closing argument. Because of the trial court's prompt curative instruction, this Court finds the trial court did not abuse its discretion in denying appellant's motion for a mistrial. Next, appellant challenges the trial court's refusal to set aside his firearm conviction on the basis that the evidence was insufficient as a matter of law to prove malice. The jury's decision to convict appellant of manslaughter and acquit him of second-degree murder does not, by itself, establish that the evidence was insufficient as a matter of law to find appellant guilty of using a firearm in the commission of a murder. Looking at the totality of the evidence, this Court finds that the jury had sufficient evidence to conclude that appellant acted with malice when he shot and killed Durham. Accordingly, the trial court's judgment is affirmed.

*Affirmed.*